317 Ga. 255
FINAL COPY

S23Y0500, S23Y0501. IN THE MATTER OF NEVADA MICHAEL TUGGLE (two cases).

PER CURIAM.

These disciplinary matters are before the Court on the consolidated report and recommendation of the State Disciplinary Review Board ("Review Board"), recommending that the Court adopt the recommendation of Special Master Daniel S. Reinhardt that Nevada Michael Tuggle (State Bar No. 301224), a member of the State Bar of Georgia since 2011, be suspended for a period of one month. The matters arose from two separate client matters in which, in combination, Tuggle was alleged to have violated Rules

1.1,[1] 1.2 (a),[2] 1.3,[3] 1.4,[4] 1.16 (d),[5] 8.4 (a) (4),[6] and 9.2[7] of the Georgia

Rules of Professional Conduct ("GRPC"), found in Bar Rule 4-102

---

[1] Rule 1.1 imposes the duty of competence on lawyers, which "requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." The Rule defines "competent representation" to mean that "a lawyer shall not handle a matter which the lawyer knows or should know to be beyond the lawyer's level of competence without associating another lawyer who the original lawyer reasonably believes to be competent to handle the matter in question."

[2] Rule 1.2 (a) provides, in relevant part, that "a lawyer shall abide by a client's decisions concerning the scope and objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued."

[3] Rule 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client. Reasonable diligence as used in this rule means that a lawyer shall not without just cause to the detriment of the client in effect willfully abandon or willfully disregard a legal matter entrusted to the lawyer."

[4] Rule 1.4 provides, in relevant part, that

(a) A lawyer shall:

. . .

(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;

(3) keep the client reasonably informed about the status of the matter; [and]

(4) promptly comply with reasonable requests for information[.]

[5] Rule 1.16 (d) provides that "[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the

(d). The maximum penalty for a violation of Rules 1.1, 1.2 (a), 1.3, 8.4 (a) (4), and 9.2 is disbarment, and the maximum penalty for a violation of Rules 1.4 and 1.16 (d) is a public reprimand.

Based on our careful review of the record, we agree with the Special Master and Review Board that Tuggle violated Rules 1.1, 1.3, 1.4, 1.16 (d), 8.4 (a) (4), and 9.2 of the GRPC.[8] But we disagree with many of the Special Master's conclusions—as adopted by the Review Board—in applying the relevant factors that inform our analysis of the appropriate discipline to impose. Much of this disagreement originates in the Special Master's rendition of the facts, which we have concluded, after a thorough review of the record, is materially incomplete, as it omits a significant measure of

---

client is entitled and refunding any advance payment of fee that has not been earned."

[6] Rule 8.4 (a) (4) provides that "[i]t shall be a violation of the [GRPC] for a lawyer to . . . engage in professional conduct involving dishonesty, fraud, deceit or misrepresentation."

[7] Rule 9.2 provides that a lawyer "shall not enter into an agreement containing a condition . . . that requires [a] person to request dismissal of a pending disciplinary complaint."

[8] As discussed below, we pretermit whether Tuggle violated Rule 1.2 (a).

undisputed evidence, mostly coming from Tuggle's own testimony, that underscores the severity of his misconduct and undercuts his arguments in favor of mitigation. Our review shows that Tuggle committed multiple violations of the GRPC; that several of these violations were committed with knowledge or intent; that he thereby caused serious actual and potential injury to clients in both matters; and that the aggravating factors substantially outweigh the mitigating factors.

Based on these findings, it is plain to us that at least a lengthy suspension, if not disbarment, is the appropriate discipline for Tuggle's misconduct in these matters, and we thus conclude that the recommended discipline is insufficient. At present, however, we decline to decide the appropriate discipline, because in one of the two matters here, certain developments have occurred since the date of the disciplinary hearing—developments on which we currently have no evidence of record, but which may affect our determination on the appropriate level of discipline. Accordingly, we reject the recommendations below and remand the case to the Board, with

4

direction to remand the case to a Special Master for further fact-finding of a limited nature and a new recommendation, consistent with this opinion and the new evidence developed below.

1. *Procedural History*

Tuggle has been a member of the Florida Bar since 2008 and the Georgia Bar since 2011. He is a solo practitioner who primarily practices elder law and assists clients with applying for various federal and state benefits.

This is Tuggle's second appearance before this Court relative to one of these disciplinary matters. Before the State Bar filed its formal complaint in State Disciplinary Board Docket ("SDBD") No. 7212, Tuggle filed a petition for voluntary discipline pursuant to Bar Rule 4-227 (b), seeking to resolve that disciplinary matter. In the petition for voluntary discipline, Tuggle admitted to violating multiple Rules and requested either a Review Board reprimand or a public reprimand. However, we rejected his petition, noting our concerns about his "fail[ure] to accept any sort of financial responsibility for the losses caused by his conduct or to provide

concrete information as to what amount of restitution is due," and about the lack of detail regarding the substance-abuse issues that allegedly led to his misconduct. *In the Matter of Tuggle*, 307 Ga. 312, 316 (835 SE2d 634) (2019) ("*Tuggle I*").

The State Bar subsequently filed the formal complaint in SDBD No. 7212, charging Tuggle with violations of Rules 1.1, 1.2 (a), 1.3, 1.4 (a), 1.16 (d), and 8.4 (a) (4), and, in connection with a separate client matter, the State Bar filed a second formal complaint in SDBD No. 7402, charging Tuggle with violations of Rules 1.2 (a), 1.3, 1.4 (a), 1.5 (a), 8.4 (a) (4), and 9.2.[9] The State Bar moved for partial summary judgment as to all violations of the GRPC charged in SDBD No. 7212, which the Special Master granted as to Rules 1.1, 1.3, 1.4, and 1.16 (d),[10] but denied as to Rules 1.2 (a) and 8.4 (a) (4). In SDBD No. 7402, the State Bar moved for partial summary

---

[9] The State Bar ultimately chose not to proceed on Rule 1.5 (a).

[10] The Special Master's summary judgment order states that it was granting summary judgment as to Rule 1.16 (b), but the substance of the order makes clear that the Special Master actually granted summary judgment as to Rule 1.16 (d).

judgment as to all violations of the GRPC except Rule 1.2 (a), and the Special Master granted summary judgment as to Rule 9.2 but denied summary judgment as to Rules 1.3, 1.4 (a), and 8.4 (a) (4). The Special Master held a consolidated final hearing on both matters in April 2022 and subsequently issued his report and recommendation. The State Bar filed exceptions and requested review by the Review Board. The Review Board issued a report and recommendation summarily adopting the Special Master's findings of fact, conclusions of law, and recommended discipline.

2. *Standard of Review*

At the outset, we note that "because this Court recognizes that the special master is in the best position to determine the witnesses' credibility, it *generally* defers to the factual findings and credibility determinations made by the special master unless those findings or determinations are clearly erroneous." *In the Matter of Eddings*, 314 Ga. 409, 416 (877 SE2d 248) (2022) (emphasis supplied). Thus, if factual findings "are supported by the record," we will generally not disturb them. *In the Matter of Cook*, 311 Ga. 206, 207 (1) (857 SE2d

212) (2021). But we afford no such deference to the conclusions of law made by the Special Master or the Review Board. See *In the Matter of Morse*, 265 Ga. 353, 354 (1) (456 SE2d 52) (1995) ("[w]hether an attorney has violated a particular standard of conduct is a legal question"), superseded on other grounds as stated in *Cook*, 311 Ga. at 207-208 (1). Therefore, we generally defer to the Special Master's findings of fact (as adopted by the Review Board here) so long as they are supported by the record, but we review de novo the conclusions of law reached below on what rules were violated and what level of discipline is appropriate.

But those are the *general* standards, and there are caveats to them; one such caveat applies here. Our review of the record here has revealed that the Special Master's rendition of the facts was incomplete in significant ways, omitting numerous undisputed facts—derived from Tuggle's own testimony and uncontested exhibits admitted at the hearing—that are relevant to the proper disposition of these matters. We have included these undisputed material facts here, despite their absence from the orders below. See

generally *In the Matter of Turk*, 267 Ga. 30, 31 (1) (471 SE2d 842) (1996) (noting that, because of its "inherent and exclusive power to regulate the practice of law," the Court exercises "the ultimate discretion in disciplinary proceedings"). See also *Inquiry Concerning Coomer*, 316 Ga. 855, 860 (2) (a) n.5 (___ SE2d ___) (2023) (noting that, in judicial disciplinary matters, "the broad and discretionary nature of our review . . . means that we need not always defer [to fact-findings below] even in situations where we would defer to a factfinder in an ordinary appeal").

3. *Relevant Facts*

(a) *SDBD No. 7212*

In early 2016, a young client whom Tuggle had previously represented in a probate matter contacted Tuggle after being served with a separate but related civil suit. On February 16, 2016, he e-mailed the client a legal services agreement with the retainer language struck through, stating in his e-mail that he was not requiring her to pay a retainer. On February 22, Tuggle e-mailed the client, asking her to return the signed agreement so he could

begin work on the case. On February 24, the client returned the executed agreement and a credit card authorization form. On March 2, the client requested an update from Tuggle; he did not respond, but charged $1,000 on the client's credit card on the same day.

Tuggle knew that the answer to the complaint was due on February 27, but he did not file an answer until March 9. Tuggle also knew that he could open the default by filing the answer and paying costs within 15 days of the default, see OCGA § 9-11-55 (a), but he did not pay costs when he filed the answer. According to Tuggle, he "attempted to pay" costs but was told by the court clerk that no costs were due at that time and that the court would send him an invoice if payment was needed.

On the day he filed the untimely answer, Tuggle e-mailed the client a copy of the answer and stated that he planned to file a motion to dismiss the following week. He did not acknowledge then, or tell her thereafter, that the answer had been filed late.

Thereafter, Tuggle performed no additional work on the case and stopped communicating with the client, who e-mailed him

periodically for updates and never received a response. In addition to ignoring the client's communications, Tuggle also failed to respond to discovery requests and other communications from opposing counsel and took no action when served with the plaintiff's motion for default judgment or the court's orders scheduling the case for trial in December 2016 and again in April 2017. Ultimately, on April 12, 2017, after the second calendar call at which neither Tuggle nor the unsuspecting client appeared, a default judgment on liability was entered against the client. In May 2017, after a damages hearing at which no one appeared on the client's behalf, the court entered judgment against the client in the amount of $815,460.

The client learned of the judgment only when she began receiving garnishment notices in July 2017. The client tried to contact Tuggle but was unable to reach him.

In the following weeks, the client made repeated attempts to obtain her file from Tuggle, to no avail. Tuggle returned her file only after she filed a Bar grievance against him.

Although Tuggle contends that he and the client mutually agreed that she was going to retain another attorney, the client disputes this claim. Tuggle testified that the client was unable to afford his fees and had told him she "could have a friend jump on the case." Tuggle claims he sent the client a "disengagement letter," dated March 15, 2016, stating that he was withdrawing from the representation, but the client denied having received such a letter.[11] It is undisputed, however, that Tuggle never filed a motion to withdraw and remained counsel of record in the case until

---

[11] The purported "disengagement letter" is suspect, to say the least. Unlike Tuggle's earlier communications with the client, which were sent via e-mail, the purported "disengagement letter" was apparently not sent via e-mail and lacks any other contemporaneous evidence of its transmission. The content of the letter, too, is incongruous, in that it refers to the client's "failure to pay the initial $2500.00 retainer" as a "breach" of the legal services agreement—despite the fact that Tuggle waived the $2,500 retainer. It also contains the suspiciously prescient statement that "failure to secure representation by counsel may result in a judgment not in your favor." And the client's subsequent inquiries about case status—which gave no indication that the client believed anything other than that Tuggle was continuing to work on the case—also seem to belie Tuggle's version of events.

Although the Special Master did not make an express finding that the letter was not authentic, he did state that "[Tuggle's] behavior subsequent to allegedly sending the letter is not consistent with" his having sent it.

12

September 2017, when the client retained new counsel to try to get the judgment set aside.

Ultimately, the client was successful in getting the judgment set aside based on the trial court's finding that the default had resulted from Tuggle's "abandonment" of his client. She later settled the case, agreeing to pay the plaintiff $15,000 in exchange for dismissal of the suit. The client spent $31,857 in attorney fees to get the judgment set aside. Tuggle admitted that he did not assist or offer to assist in the effort to get the judgment set aside. Tuggle also admitted that he had not reimbursed the client, testifying that he did not know the "exact amount" of her attorney fees despite his having submitted as part of his hearing exhibits the invoice documenting those fees.

The client filed a malpractice suit against Tuggle in June 2018. In April 2019, the client's counsel moved for and was granted an order requiring Tuggle to make himself available for a deposition in the case. Tuggle admitted that on the day of his scheduled deposition, he submitted a notice of bankruptcy—resulting in an

automatic stay of the proceedings. Tuggle admitted that he had not yet given a deposition in the case.[12]

When asked whether he acknowledged making any mistakes in his representation of the client, Tuggle testified that "maybe [he] could have been more insistent" in getting the court to accept his payment of fees with the untimely answer. He also testified that "maybe the seriousness of the situation could have been communicated a little better, or much better" and that he "could have followed through in making sure [the client] did secure counsel." But he also insisted, "I sent her a disengagement letter, so

---

[12] According to supplemental briefs filed by the State Bar after the case was submitted to this Court, a final judgment in favor of the client was entered in the malpractice suit on March 28, 2023. In its supplemental briefs, the State Bar offered evidence of the final judgment, and other post-disciplinary-hearing developments in the malpractice suit, in further support of its position in this case. Tuggle argued in supplemental response briefs that it would be inappropriate for the Court to consider these post-hearing developments here. We decline to consider these developments, which are not part of the record before us and on which no fact-findings have been made below. But as we discuss below, we believe that the disposition of the malpractice suit and Tuggle's conduct in those proceedings may be relevant to determining the proper level of discipline to impose, and we thus conclude that a remand is necessary for further fact-finding in this regard. We appreciate the State Bar bringing these matters to our attention, even if we cannot rely on them in this posture.

I felt like I kind of handled [it]. . . . I was a young attorney at the time, and I thought that was enough." And at another point, he stated, "that's not my job to find her [new] counsel. . . . I am not going to drive her to another attorney's office and say let's hire counsel." When asked whether he had ever apologized to the client, he replied, "Should I have sent flowers? I don't know what you're saying," and, after being instructed to answer the question, stated, "I don't know why it's relevant."[13] After acknowledging that in his sworn response to the client's Bar grievance he had claimed the client "intentionally deceived [him] to perform legal services without intending to pay" and that by filing the grievance she was "blaming others for her own malfeasance," he maintained that he was not blaming the client but also stated that "she should have maybe taken it a little more serious[ly] in securing counsel."

Tuggle also contended that his conduct in relation to this client had been affected by a substance-abuse disorder. Tuggle testified

---

[13] Similarly, at other points during the hearing, Tuggle responded to questions only after being instructed to answer and on at least three occasions replied with dismissive statements such as, "[t]his is ridiculous."

that at the time he had been abusing Adderall during the day and drinking alcohol "to help bring [him] down" and sleep at night. He entered a 90-day outpatient treatment program for his Adderall dependency in 2016 or 2017[14] and has not used Adderall since that time. Tuggle testified that, after later realizing that his alcohol use was problematic, he entered another outpatient treatment program in June 2019.

An expert psychiatrist who evaluated Tuggle in 2022 opined that his stimulant-use disorder was "under reasonable control" but declined to say the same about Tuggle's alcohol-use disorder. Rather, the expert opined, due to Tuggle's "lack of active treatment" for his alcohol-use disorder, he was at moderate risk of relapse and,

---

[14] Although treatment records state that Tuggle began this program in June 2017, Tuggle testified that this date is incorrect and that he actually began in June 2016. The timing of his treatment is significant to the extent that Tuggle claims that his failure to respond to communications in the client's case was in part attributable to the time and energy he was devoting to his recovery, as he testified at one point in that regard that during the time after he sent the disengagement letter, he "went into treatment" and "was really kind of taking care of myself at that point, not really aware of every detail on this case." The Special Master did not make a specific finding on the date of Tuggle's treatment, noting at the hearing that "irrespective of whether he was seeking treatment or not during that period of time," it was undisputed that "his law office was open."

because of his admitted occasional use of alcohol, his disorder was not "in remission." At the hearing, Tuggle admitted that he does still drink alcohol "on special occasions" and that he is not in treatment with a licensed health care professional, but he also testified that he was participating in a recovery support group.

As far as the impact of his addictions on his work generally, Tuggle testified that the Adderall caused him to "just want to sit at [my] computer and do work, honestly. There is no better high than getting that work done." He did not testify specifically about any impact of his alcohol use on his ability to work. As to the effect of his Adderall addiction on his work for the client here, Tuggle testified, "I don't know if my impairment affected my representation of her," adding that "Maybe I didn't communicate as strongly as I should have." He later reiterated that his addiction had nothing to do with the quality of his work on the client's case, but acknowledged that he was "a little short-tempered" with his clients and not as "thorough" in communicating with them as he should have been.

(b) *SDBD No. 7402*

In December 2018, Tuggle was hired by an elderly client to assist in applying for Medicaid benefits for his wife, who had recently been admitted to a nursing home. Tuggle understood that filing the Medicaid application was "time sensitive" because the wife's Medicare benefits had expired and thus the clients would be responsible for paying out-of-pocket until the Medicaid application was approved. Because the client had dementia and was hard of hearing, he was assisted in his affairs by his daughters and granddaughters. Tuggle was paid $8,000 for his services.

As part of the process to qualify the clients for Medicaid, Tuggle helped set up a qualified income trust ("QIT"), which was established in mid-March 2019. The day after the trust was set up, Tuggle sent a letter to the nursing home, which was copied to the client, referring to her "pending" Medicaid application and stating that "we applied for Medicaid benefits effective March 1, 2019." It is undisputed that Tuggle had not submitted an application at this time.

During the next several months, the nursing home made frequent inquiries to the family and Tuggle about the status of the application. Although Tuggle testified that he had faxed[15] an application in May 2019, there was apparently no record of any faxed application in the Department of Human Services' system.

Tuggle finally submitted the application on July 15, 2019. In August 2019, the application was granted, with benefits retroactive to May 1, 2019. This meant that the family would be responsible for the nursing home charges from December 2018 through April 2019.

In November 2019, one of the client's daughters sent a demand letter on the client's behalf to Tuggle noting that the nursing home had billed the client $26,156 for her mother's nursing home care through April 2019. Tuggle responded that he was preparing a "formal appeal" to Medicaid but that he was also willing to pay "monies totaling two months of care," in the amount of $12,684, which he would send to the nursing home in monthly installments

---

[15] Tuggle admitted that he knew that the application could be submitted electronically.

of $2,500. Tuggle did not file an appeal. But he did pay the nursing home a total of $12,000 or $12,500.

The client ultimately hired new counsel and filed suit against Tuggle. Tuggle failed to answer, and a default judgment was entered in the amount of $22,176, plus $2,000 in attorney fees and costs. As of the disciplinary hearing, Tuggle had not paid the judgment.

It is undisputed that, after the client filed a Bar grievance, Tuggle attempted to negotiate a settlement conditioned on the client's dismissal of the grievance. Tuggle testified that he did not know at the time that the GRPC prohibit lawyers from entering into such agreements.

Tuggle contends that he was hampered in his ability to file the application by the client's family's failure to provide necessary documents in a timely manner. In his response to the Bar grievance, he stated that the client's daughter was unable to provide requested documents because she "was having personal issues," a claim he repeated in his hearing testimony. By contrast, several of the client's family members testified that they consistently gave Tuggle all

documents he requested, that Tuggle had never told them he lacked the proper documents to file the application in a timely manner, and that they had great difficulty in contacting Tuggle, whose voicemail was frequently full and who often failed to respond to calls and e-mails.

Tuggle acknowledged at the hearing that he never told the nursing home that the Medicaid application was being delayed due to the family's inability to provide documents but explained that he was simply trying to avoid "throw[ing] them under the bus." He also acknowledged that he never wrote a letter to the family explaining that their failure to provide documents was preventing him from completing the application and never attempted to terminate the representation due to their non-cooperation. But when asked about the family's claims that they provided all documents upon his request, he testified that "they are sadly mistaken, and that's my word against theirs." The Special Master, while making no express findings of fact on whether the clients had provided documents in a

21

timely manner, did conclude on this point that "the evidence is overwhelming against [Tuggle's] position."

In contrast to his contention in SDBD No. 7212, Tuggle does not claim that his substance-abuse disorders affected his performance in the matter underlying SDBD No. 7402. Rather, when asked whether any "impairment issues" played a role in the matter underlying SDBD No. 7402, Tuggle responded, "Absolutely not. Didn't have anything to do with this case," and later reiterated that those issues "didn't affect my services whatsoever."

4. *The Special Master's Orders*

As we discuss in detail in our analysis in Division 6, we take issue with many of the Special Master's determinations and conclusions. The following discussion is merely a narrative of these determinations and conclusions, and, except in a few instances, we reserve our commentary for Division 6.

(a) *Rules Violated*

In SDBD No. 7212, the Special Master granted the Bar's motion for summary judgment as to Tuggle's violations of Rules 1.1, 1.3, 1.4, and 1.16 (d). In his report and recommendation, the Special Master concluded that Tuggle had also violated Rule 1.2 (a) but had not violated Rule 8.4 (a) (4).

As to Rule 1.1, the Special Master concluded that Tuggle violated his duty of competence by failing to pay costs when he filed the untimely answer. He noted that OCGA § 9-11-55 (a) is "clear and basic" in requiring the payment of costs to open a default and that, notwithstanding whether Tuggle was misinformed by a court employee about whether costs were due, "[t]he competence required of a general practitioner demanded that [Tuggle] pay the costs."

As to Rules 1.3, 1.4, and 1.16 (d), the Special Master found that, whether or not Tuggle had sent the purported "disengagement letter," Tuggle's failure to file a notice of withdrawal, his failure to communicate with the court or opposing counsel, and his failure to communicate with the client and protect her interests amounted to

violations of his duties of diligence and communication and his obligations upon the termination of representation.

As to Rule 1.2 (a), the Special Master stated that this particular rule "appears to be inapposite to this circumstance" because it "is more appropriately invoked" when the lawyer "fails to abide by the client's decisions concerning scope and objectives of the representation." But the Special Master went on to note that the rule "does require compliance with Rule 1.4," which Tuggle had already been found to have violated, and that, even if Tuggle did in fact send the client the purported disengagement letter, he still should have followed up when he continued to receive documents about the case, and his failure to do so was a violation of Rule 1.2 (a).

In finding no violation of Rule 8.4 (a) (4), the Special Master stated, "If one believes [Tuggle's] testimony that [the client] told him that she would obtain substitute counsel, then she would not have been misled with respect to subsequent events that occurred. If such a conversation did not occur, as [the client] claims, then [Tuggle] did

not mislead [the client] of subsequent events because of his failure to communicate at all." It thus appears that the Special Master reasoned that Tuggle, in failing to tell the client about the untimely answer and its consequences, had no intent to deceive her either because (a) she was getting another lawyer, who presumably would apprise her of the case status, or (b) he was simply abandoning her.[16] The Special Master also concluded that Tuggle "was suffering from impairment issues which would seem to negate the intent and hurtful purposefulness required to be dishonest, commit fraud, deceit, or misrepresentation."

In SDBD No. 7402, the Special Master granted the Bar's motion for summary judgment only as to Rule 9.2. In his report and

___

[16] For whatever reason, the Special Master seems to have taken pains to avoid making any credibility determinations here, even when Tuggle's testimony was diametrically opposed to that of other witnesses. We take this opportunity to emphasize that the making of credibility determinations is a fundamental part of the Special Master's duty as factfinder, and when this duty is not fulfilled, it can be difficult for this Court to fulfill its duty to determine the appropriate discipline in the matter at hand. See Bar Rule 4-210 (i), (j) (giving Special Master power and duty to "decide questions of . . . fact raised" during disciplinary hearings and "make findings of fact" for consideration by this Court); see also *Mercer Univ. v. Stofer*, 306 Ga. 191, 202 (5) (830 SE2d 169) (2019) ("where there is a conflict in the evidence . . . , it is for the fact finder to resolve the conflict" (citation and punctuation omitted)).

25

recommendation, the Special Master concluded that Tuggle had also violated Rules 1.2 (a), 1.3, 1.4, and 8.4 (a) (4).

In the summary judgment order, the Special Master noted that it was undisputed that Tuggle had entered an agreement with his clients' "successor counsel" under which he agreed to "make a payment" if they dismissed their bar complaint against him. While finding that Tuggle had "made payment in full to the clients,"[17] the Special Master concluded that Tuggle's agreement was "technically" a violation of Rule 9.2.

In his report and recommendation, the Special Master concluded that Tuggle had violated Rule 1.2 (a) by failing to (a) file the Medicaid application by the date he had promised; (b) provide specific information about what documents he needed to complete the application or terminate the representation for non-cooperation; and (c) communicate with the client about the "truthful status" of the application.

---

[17] The Special Master did not explain what he meant by this statement and provided no record support for it.

As to Rule 1.3, the Special Master stated that whether Tuggle was diligent depended on whether he had a valid reason for not filing the application until seven months after the client retained him. Without expressly saying so, the Special Master appears to have rejected Tuggle's assertions about the client's family's failure to provide the necessary documents and thus to have found that Tuggle did not have a valid reason for his delay.[18] The Special Master also cited Tuggle's representation to the nursing home in March 2019 that the application was "pending," rejecting as "unreasonable" Tuggle's claim that in his mind "pending" meant he was "working on the application" and finding that this characterization was intended to hold the nursing home "at bay."

The Special Master found that Tuggle had violated Rule 1.4 in that, to the extent he needed documents to complete the Medicaid

[18] On this topic, the Special Master stated, "the problem with [Tuggle's] position is the lack of clarity in his actions and communications with the [client's] family. Why is there no correspondence on this issue; why is there [no] correspondence with respect to specific missing documents; why is there no discussion of this issue with [the nursing home]." The Special Master also noted that "there is no evidence as to what specific missing docs [sic] were finally received which enabled [Tuggle] to file the application."

27

application, "his requests were neither specific nor in writing" and thus were "inadequate." The Special Master noted the substantial evidence about the difficulties the client and nursing home had in communicating with Tuggle and, while allowing that "clients can be difficult and their expectations unreasonable," observed that it was Tuggle's responsibility to either "get[ ] the job done" or let the client know if he could not do so in a timely manner.

As to Rule 8.4 (a) (4), the Special Master concluded that Tuggle had violated this rule by misrepresenting to both the client and the nursing home that he had filed the Medicaid application in March 2019, when in fact Tuggle did not file the application until July 2019.

(b) *Factors in Determining the Appropriate Discipline*

Having determined that Tuggle had violated Rules 1.1, 1.2 (a), 1.3, 1.4, 1.16 (d), 8.4 (a) (4), and 9.2,[19] the Special Master proceeded to consider the appropriate level of discipline, referring to the ABA

---

[19] Although the Special Master found a Rule 9.2 violation in his summary judgment order in SDBD No. 7402, there was no mention of this violation in the report and recommendation. It is thus unclear whether this violation was considered in determining the appropriate level of discipline.

Standards for Imposing Lawyer Sanctions. See *Morse*, 265 Ga. at 354 (2). The relevant factors for consideration include (1) the duty violated; (2) the lawyer's mental state; (3) the potential or actual injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. See id.

*Duties Violated.* The Special Master concluded that in both disciplinary matters, Tuggle violated his duties of diligence, competence and candor.

*Mental State.* The Special Master concluded in regard to SDBD No. 7212 that Tuggle's mental state was one of negligence. He concluded that there was not clear and convincing evidence that when Tuggle filed the answer, he failed to pay costs with the intent to render the filing ineffective; rather, "Tuggle's mistake was to rely on what the clerk told him." The Special Master concluded that Tuggle's "[f]ailure to pay costs because of ignorance or incompetence could not result in intentional or knowing misleading of" the client. The Special Master also reiterated that Tuggle's "impairment issues" "negate[d]" any "intent and hurtful purposefulness." In

29

regard to SDBD No. 7402, the Special Master concluded that Tuggle's Rule 8.4 (a) (4) violation—misrepresenting the status of the Medicaid application in order to "hold [the nursing home] at bay"— was knowing and intentional. The Special Master determined that, as to any other allegations, there was not clear and convincing evidence of a knowing or intentional mental state.

*Actual or Potential Injury*. The Special Master noted that Tuggle's conduct in SDBD No. 7212 resulted in "potentially serious financial injury" in the form of the judgment against the client and the "actual expense" of attorney fees incurred to get the judgment set aside. But the Special Master also observed that "Tuggle testified he would be willing to pay" the attorney fees, noting in addition that "[a] resolution of the [malpractice suit] has not as yet been accepted by the parties." In regard to SDBD No. 7402, the Special Master concluded that the client had "suffered no actual injury and, potentially, two months of [nursing home] expense not paid by Medicaid." He went on to explain that the client would not have qualified for Medicaid until the QIT had been established in March

2019; that, because there was no evidence that Tuggle had been tardy in setting up the QIT, and because benefits were received retroactive to May 1, 2019, the only injury was the cost of the nursing home for March and April; and that, because Tuggle paid $12,000 to the nursing home, Tuggle had "made [the client] whole." As for the unpaid judgment against Tuggle, the Special Master concluded that "[u]nder the circumstances, that is a civil rather than a disciplinary matter."

*Aggravating and Mitigating Factors.* As aggravating factors, the Special Master found that (1) the conduct in these two matters evidenced a pattern of misconduct—while also noting the absence of evidence of any prior instances of similar misconduct; (2) Tuggle had violated several rules; and (3) the victims in both matters were "vulnerable" in that one was "a young mother" and the other was an elderly man with dementia—while also finding that "both were able to take active, appropriate steps to protect their interests" during Tuggle's representation.

In mitigation, the Special Master first noted that Tuggle had no prior disciplinary history. In addition, he concluded that Tuggle had not acted with a dishonest or selfish motive, in that his conduct "in both cases was negligent and affected by impairment," and that, even as to his intentional misrepresentation in SDBD No. 7402, the eventual approval of the Medicaid application in combination with Tuggle's payments to the nursing home rectified the harm caused by his delay. The payments to the nursing home were also cited as evidence of Tuggle's remorse and good faith effort to make restitution, and the Special Master found these mitigating factors also to apply in SDBD No. 7212, stating—without citing any record support—that Tuggle "remains open to" reimbursing the client's attorney fees in connection with getting the default judgment set aside. The Special Master also noted that Tuggle had exhibited a cooperative attitude toward the disciplinary proceedings by "participat[ing] appropriately in the disciplinary process" and "attempt[ing] to resolve these matters through negotiation with the Bar," and that he had presented evidence of his good character and

32

reputation through his own testimony and the testimony of four character witnesses: Tuggle's father, his legal assistant, a long-time friend, and a "fellow lawyer."[20]

The Special Master also concluded that Tuggle's substance use disorders were a substantial mitigating factor in these matters, finding that "[t]o a significant extent," Tuggle's misconduct in both matters "was caused, or materially contributed to, by his Stimulant and/or Alcohol Use Disorders," and noting that, even though Tuggle was not "technically" in remission, he had been adjudged as currently fit to practice law.

---

[20] As to whether Tuggle's experience in the practice of law qualified as aggravating (in that he had "substantial experience") or mitigating (in that he was "inexperienced"), the Special Master's conclusions are unclear. In discussing aggravation, the Special Master noted without elaboration that Tuggle was admitted to practice in Florida in 2008 and in Georgia in 2011. He also noted that, at the time of the events in SDBD No. 7212, Tuggle had "little litigation experience." In discussing mitigation, the Special Master simply recited that, at the time of the events in SDBD No. 7212, Tuggle had been practicing for five years in Georgia and eight years total, and that, at the time of SDBD No. 7402, Tuggle had been practicing for eight years in Georgia and 11 years total.

(c) *Recommendation of Discipline*

Based on his findings of fact, conclusions as to Tuggle's Rule violations, and application of the relevant factors, the Special Master recommended that Tuggle be suspended from the practice of law in Georgia for one month with no conditions for reinstatement. Noting that this Court does not act punitively in disciplinary matters and that discipline should be no more severe than necessary to accomplish its established purposes, the Special Master opined that (1) a penalty more severe than a one-month suspension was unnecessary to protect the public because Tuggle's misconduct was largely caused by his substance-use disorders, from which he has been largely rehabilitated; (2) "[a] suspension of any length seriously penalizes a lawyer" because notices of suspension are publicized via various channels, see Bar Rule 4-219 (a); (3) a one-month suspension would send a message to other lawyers facing substance-use disorders that, while the Court "will take action necessary to maintain the ethics of the profession," it will also "not impose discipline so harsh as to imperil" the practice of a lawyer successfully

34

coping with disorders that contributed to disciplinary violations; (4) disciplinary sanctions must be commensurate with the particular facts of each case; and (5) the mitigating factors here—particularly Tuggle's recovery from his substance-use disorders and current fitness to practice law—outweighed the factors in aggravation.

5. *State Bar's Exceptions and Tuggle's Response*

The State Bar argues that the Review Board erred in (1) adopting the Special Master's conclusion that Tuggle did not violate Rule 8.4 (a) (4) in SDBD No. 7212; and (2) adopting the recommendation of a one-month suspension with no conditions. On the first issue, the State Bar contends that the Special Master's findings of fact do not support his conclusions that Tuggle did not intentionally mislead the client about the status of her case and that his "impairment issues" somehow negated the intent required for a Rule 8.4 (a) (4) violation.

As to the recommended discipline, the State Bar argues that the Special Master and the Review Board erred in their findings on Tuggle's mental state—which the State Bar contends was knowing

rather than negligent—and the extent of the injury suffered by the clients, which the State Bar contends was both financial and emotional. The State Bar also contends that the Special Master erred by declining to apply certain aggravating factors—such as a dishonest or selfish motive; refusal to acknowledge the wrongful nature of conduct; vulnerability of the victims; and indifference to making restitution—and, conversely, by applying the mitigating factors of a lack of a dishonest or selfish motive; timely good faith effort to make restitution; evidence of good character or reputation; and remorse. In addition, the State Bar disputes the Special Master's finding that Tuggle participated appropriately in the disciplinary process, contending that he demonstrated contempt for the disciplinary proceedings, conditioned his willingness to resolve the matters only if he received a less-severe penalty, and acted confrontationally by arguing with the Special Master and Bar Counsel at the disciplinary hearing. The State Bar contends further that the Special Master erred by considering Tuggle's substance-use disorders mitigating, noting Tuggle's testimony that he did not know

36

whether his Adderall dependency impaired his representation in SDBD No. 7212 and his affirmative denial that his alcohol use affected his representation in SDBD No. 7402, and citing the opinion of the psychiatrist who examined him in 2022 that he was at risk of relapse for his alcohol addiction because he was not completely abstinent and was not participating in psychotherapy.

The State Bar argues that the recommendation of a one-month suspension is not appropriate, given the significant consequences of Tuggle's actions, this Court's need to protect the public, and this Court's precedent, and contends that the Court should impose a suspension of at least 18 months, with several conditions of reinstatement, including restitution to both clients and a psychiatrist or psychologist's timely certification of current fitness to practice law.

Tuggle responds that the Special Master did not err in his findings or conclusions and that its recommendation of a one-month suspension was appropriate given the circumstances.

6. *Analysis*

"The primary purpose of a disciplinary action is to protect the public from attorneys who are not qualified to practice law due to incompetence or unprofessional conduct, but this Court is also concerned with the public's confidence in the profession generally." *Cook*, 311 Ga. at 213 (3) (a). The sanction imposed for disciplinary infractions should be one that is sufficient to penalize the offender for his wrongdoing, deter other attorneys from engaging in similar behavior, and indicate to the general public that the courts will maintain the ethics of the profession. See id. The ABA Standards are "generally instructive as to the question of punishment," but "they are not controlling." Id. "Instead, the level of punishment imposed rests in the sound discretion of this Court." Id.

(a) *Rules Violated*

Bearing in mind that the State Bar has the burden of proving violations of the GRPC by clear and convincing evidence, see Bar Rule 4-221.2 (b), we now turn to the Special Master's conclusions as to Tuggle's violations of the GRPC.

SDBD No. 7212. The Special Master concluded in SDBD No. 7212 that Tuggle violated Rules 1.1, 1.2 (a), 1.3, 1.4, and 1.16 (d). Neither Tuggle nor the State Bar contests any of these conclusions. The Special Master also concluded that Tuggle did not violate Rule 8.4 (a) (4), a conclusion that the State Bar does contest.

We agree that the State Bar has shown by clear and convincing evidence that Tuggle violated Rules 1.1, 1.3, 1.4, and 1.16 (d). He violated his duty of competence, as prescribed in Rule 1.1, by failing to file a timely answer and thereafter failing to take the necessary steps to open the default. He violated his duty of diligence, as prescribed in Rule 1.3, by filing the client's answer late and ultimately, after failing to open the default, abandoning the client and her matter. He violated his duty of communication, as prescribed in Rule 1.4 (a), by failing to inform the client about the status of and developments in her case and failing to respond to her communications about the case. And he violated his duties upon termination of representation, as prescribed in Rule 1.16 (d), by failing to take any steps to protect his client's interests when he

39

terminated his representation—allowing her case to progress to a default judgment and failing to communicate this to her while he was still counsel of record—and later refusing to return her file upon her request.

With respect to Rule 8.4 (a) (4), we conclude that the Special Master erred and that the State Bar has shown by clear and convincing evidence that Tuggle engaged in conduct involving dishonesty and misrepresentation. We have held that Rule 8.4 (a) (4) encompasses conduct that is "intended or *likely* to mislead another," *In the Matter of Woodham*, 296 Ga. 618, 625 (3) (769 SE2d 353) (2015) (emphasis supplied), which may include misrepresenting to a client the status of a case. See *In the Matter of Hardwick*, 297 Ga. 808, 808-809 (777 SE2d 442) (2015) (lawyer violated Rule 8.4 (a) (4) by misrepresenting to client the filing status of a motion for expedited bond); *In the Matter of Hammock*, 278 Ga. 385, 386-387 (602 SE2d 658) (2004) (lawyer violated Rule 8.4 (a) (4) where he misled his client into believing that her cases were pending long after they were time-barred or dismissed).

Here, it is undisputed that Tuggle, knowing he had filed the answer late and without fully complying with the requirements of OCGA § 9-11-55 (a), e-mailed his client that same day with a message that was intended to—and did in fact—make her believe the representation was proceeding apace. Further, he knowingly perpetuated the client's misapprehension by failing to respond to her communications about the case after his purported withdrawal, particularly as he was made aware of further developments in the case. It is undisputed that the client was unaware of any problems with her case until she began receiving garnishment notices—a clear illustration of the misleading effect of Tuggle's acts and omissions. As for the Special Master's conclusion that Tuggle's "impairment issues" somehow prevented him from forming the requisite intent to violate Rule 8.4 (a) (4), we are aware of no precedent—certainly, the Special Master cited none—that permits a mitigating factor to preclude the finding of a Rule violation, as opposed to justifying a lighter penalty for the violation found.

41

Therefore, we conclude that Tuggle violated Rule 8.4 (a) (4) in SDBD No. 7212.

SDBD No. 7402. The Special Master concluded in SDBD No. 7402 that Tuggle violated Rules 1.2 (a), 1.3, 1.4, 8.4 (a) (4), and 9.2. Neither Tuggle nor the State Bar contests any of these conclusions.

We agree that the State Bar has shown by clear and convincing evidence that Tuggle violated Rules 1.3, 1.4, 8.4 (a) (4), and 9.2. He violated his duty of diligence by failing to file the Medicaid application until four months after the QIT was established. And if, as Tuggle claims, he lacked necessary documents to be able to file the application, then he also violated his duty of diligence by failing to request those documents from his client with the requisite specificity and urgency to enable him to do his job in a timely manner. Likewise, if one is to believe Tuggle's claim that he lacked necessary documents, then he violated Rule 1.4 (a) by failing to communicate clearly that he needed specific documents to be able to accomplish the client's objectives. And regardless, Tuggle violated Rule 1.4 (a) by failing to respond to communications from the client

and his family. He violated Rule 8.4 (a) (4) by baldly misrepresenting to both the client and the nursing home that he had filed the Medicaid application in March 2019. And he violated Rule 9.2 by entering into a pre-suit settlement with the client conditioned on his agreement to drop his Bar grievance. In sum, we conclude that Tuggle has violated Rules 1.1, 1.3, 1.4 (a), 1.16 (d), 8.4 (a) (4), and 9.2 in these matters.[21]

(b) *Factors in Determining the Appropriate Discipline*

As noted above, in determining the appropriate discipline, we examine (1) the duty violated; (2) the lawyer's mental state; (3) the potential or actual injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. See *Morse*, 265 Ga. at 354 (2).

---

[21] The Special Master also concluded that Tuggle violated Rule 1.2 (a) in both matters, and neither party contests this conclusion. However, we note that Rule 1.2 (a) requires a lawyer to "abide by a client's decisions concerning the scope and objectives of representation," and in our view, Tuggle did not necessarily violate this provision in either matter. But whether Tuggle violated Rule 1.2 (a), in addition to all the other Rules he violated, is not material to the ultimate disposition of this case, and thus we pretermit this issue.

*Duties Violated.* We agree with the Special Master that Tuggle violated his duties of diligence, competence and candor. We note further that he violated his duties of communication, his duties upon termination of representation, and his obligation not to enter agreements conditioned on dismissal of a pending disciplinary complaint.

*Mental State.* With respect to SDBD No. 7212, we disagree with the Special Master's determination that Tuggle's mental state was exclusively one of negligence. We agree that, if one credits Tuggle's claim that the court clerk told him not to pay costs when he filed the untimely answer, his failure to submit fees with the answer was, at least arguably, merely negligent. But the evidence is undisputed that Tuggle knew the answer was due no later than February 27, yet made no effort to file the answer until March 9. The evidence is also undisputed that Tuggle knowingly failed to inform his client that the answer was not timely filed and knowingly perpetuated his client's ignorance by cutting off his communications with her after allegedly terminating his representation; the inescapable conclusion

44

from this evidence is that Tuggle intended to mislead the client into believing her case was being properly handled. Tuggle also knowingly ignored communications from opposing counsel and the court, neither of which had been informed of his purported withdrawal. And to the extent the Special Master determined that Tuggle's substance-use disorders somehow negated his intent or knowledge, we reject that reasoning, which would have the effect of "double-counting" Tuggle's substance-use disorders as a mitigating factor—a subject we address below. Thus, we conclude that, in SDBD No. 7212, Tuggle acted with intent or at least knowledge in most of his acts of misconduct.

With respect to SDBD No. 7402, we agree with the Special Master that Tuggle acted with the intent to mislead when he sent the March 2019 letter to his client and the nursing home stating that the Medicaid application had been filed and was pending. To the extent the Special Master determined that Tuggle's $12,000 payment to the nursing home somehow negated or mitigated this mental state, we reject that determination as another instance of

45

the double-counting of a mitigating factor. And although Tuggle claimed not to have known that the GRPC prohibit agreements conditioned on the dismissal of a Bar complaint, his ignorance of the Rules is no excuse, see Preamble to GRPC, Par. 11 ("Every lawyer is responsible for observance of the [GRPC].")—and because he knew he was entering into the agreement, his state of mind was knowing. As to Tuggle's other deficiencies in this matter—his delay in filing the application and his failures in communicating—we conclude that Tuggle's conduct was merely negligent.

In sum, Tuggle's misconduct was committed with a mix of intent, knowledge, and negligence.

*Actual or Potential Injury.* We conclude that Tuggle's misconduct caused both actual and potential injury to the clients in both matters.

In SDBD No. 7212, it is undisputed that Tuggle's late-filed answer, deficient effort to open default, and subsequent abandonment of his client exposed the client to serious financial injury in the form of a more than $800,000 adverse judgment and

required the client to spend more than $30,000 in attorney fees to get the default judgment set aside. We thus agree with the Special Master that Tuggle's misconduct caused serious actual and potential injury.[22]

In SDBD No. 7402, we conclude that the Special Master erred by finding that the client suffered no actual injury. Even if, as the Special Master found, Tuggle's lack of diligence was the cause of only two months' worth of forfeited Medicaid payments and his $12,000 payment fully covered those costs, there is still the matter of the unpaid civil judgment of more than $22,000 and the attorney fees spent seeking that relief. Characterizing the judgment as a "civil" matter, as the Special Master did, does not alter the fact that the client had to hire another lawyer to seek redress over Tuggle's mishandling of his case. Added to the actual financial injury was the potential injury the client faced—being unable to continue his wife's

---

[22] Although the Special Master apparently credited Tuggle's testimony that he "would be willing to pay" the client's attorney fees, the fact remains that, at this point in time, the client has parted with more than $30,000 with no guarantee that she will recover it.

nursing home care—as a result of Tuggle's delay and mismanagement of the matter.

In sum, Tuggle's misconduct caused both actual and potential injury of a serious nature to his clients in both matters.

*Aggravating and Mitigating Factors*. We agree with several of the Special Master's determinations on aggravating and mitigating factors. As to aggravation, we agree that Tuggle's conduct in these matters amounts to a pattern of misconduct characterized by a lack of diligence, misrepresentations designed to prevent the detection of his dereliction, and the failure to communicate with clients. We agree that this pattern of misconduct resulted in the violation of multiple rules of professional conduct. And we agree that the victims in both matters—an overly trusting young client in SDBD No. 7212, and an elderly man with dementia in SDBD No. 7402—were vulnerable. As to mitigation, it is undisputed that Tuggle has no prior disciplinary history and that he presented four witnesses that

attested to his good character and reputation.[23] We agree that the evidence does not show a *selfish* motive because there is no indication that Tuggle's conduct was motivated by a desire for personal gain—although he clearly had a *dishonest* motive in lying to his clients and others. Like the Special Master, we view Tuggle's experience in the practice of law as neither particularly aggravating nor mitigating.[24]

Where we significantly part ways with the Special Master, however, is in his determinations as to Tuggle's acknowledgment of wrongdoing and his remorse, his timely good-faith efforts to make restitution, and the mitigating effect of his substance-use disorders.[25]

---

[23] It is, however, difficult to assign a great deal of weight to the unsurprisingly favorable opinions of Tuggle's father, legal assistant, and long-time friend.

[24] Note, however, that in at least one case we have suggested that five to seven years in practice constitutes "substantial experience" for these purposes. See *In the Matter of Arrington*, 308 Ga. 486, 487-488 (841 SE2d 663) (2020) (suggesting that lawyer had substantial experience when he was admitted in 2008 and misconduct occurred from 2013 to 2015).

[25] We also disagree with the Special Master's conclusion that we should weigh in mitigation Tuggle's "cooperative attitude" in the disciplinary

49

First, as to Tuggle's acknowledgment of wrongdoing and remorse, the hearing testimony on its face shows that Tuggle was willing to concede that he had committed only minor infractions, and only with caveats, excuses, and victim-blaming. In SDBD No. 7212, Tuggle acknowledged that "maybe [he] could have been more insistent" in getting the court to accept his payment of fees with the untimely answer, and that "maybe the seriousness of the situation could have been communicated a little better, or much better" to the client and that he "could have followed through in making sure [the client] did secure counsel." Even then, Tuggle followed up by noting that he did send her a disengagement letter so he "felt like [he] kind of handled [it]," and that it was "not [his] job to find her [new]

---

proceedings. The Special Master found in this regard that Tuggle had "participated appropriately in the disciplinary process" and "attempted to resolve these matters through negotiation with the Bar." Although there may be some truth to these findings, we also note that the transcript of the disciplinary hearing on its face shows that Tuggle was at times not just argumentative but acerbic, prompting the Special Master and his own lawyer to chastise him. Although lawyers have every right to defend themselves zealously against disciplinary charges—including in their responses to Bar counsel—when they cross the line from zealous advocacy into blatant disrespect for the disciplinary proceedings and those involved in it, they may not claim cooperativeness as a mitigating factor. Such was the case here, and we thus decline to weigh this factor in mitigation.

counsel," at one point quipping, "Should I have sent flowers?" Even on a cold record, such comments are not indicative of acknowledgment and remorse.[26]

In SDBD No. 7402, Tuggle's record on acknowledgment of wrongdoing and remorse is mixed. To this day, he has never expressly acknowledged any wrongdoing, insisting that his delay in filing the Medicaid application was a result of the client's family's failure to provide the necessary documents. Particularly given the Special Master's finding that "the evidence is overwhelming against [Tuggle's] position" in this regard, Tuggle's blaming of the family looks like the opposite of accepting responsibility. On the other hand, it is undisputed that Tuggle made $12,000 in payments to the

---

[26] And all this is not to mention the "disengagement" letter—the elephant in the room that the Special Master declined to directly confront. As noted above, the Special Master, while not making a finding on whether Tuggle actually sent this letter, nonetheless observed that "[Tuggle's] behavior subsequent to allegedly sending the letter [was] not consistent with" his having done so. If one believes—as the Special Master appears to have suggested—that this letter was a post-hoc effort to paper over Tuggle's abandonment of his client, then the letter is further proof of, among other things, Tuggle's willful refusal to accept responsibility for his misconduct.

nursing home on the client's behalf, which was a significant implicit acknowledgment of responsibility. So while Tuggle has refused to admit in words that he acted less than diligently, his effort to compensate for some costs of the delay was a concession of sorts.

The payment to the nursing home is, of course, also relevant to the issue of restitution. We agree with the Special Master that the $12,000 payment is evidence of a timely good-faith effort at restitution in SDBD No. 7402. We note, however, that such payment appears not to be full restitution, given the more than $22,000 judgment entered against Tuggle that, at the time of the disciplinary hearing, Tuggle had failed to satisfy. See *In the Matter of Farmer*, 307 Ga. 307, 310 (835 SE2d 629) (2019) (attorney's failure to satisfy a judgment in a civil RICO case was aggravating factor); *In the Matter of Briley-Holmes*, 304 Ga. 199, 207 (815 SE2d 59) (2018) (attorney's failure to make payment toward arbitration awards was aggravating factor). So as to this factor, too, Tuggle's record in SDBD No. 7402 is mixed at best.

In SDBD No. 7212, however, there is no evidence of a good-faith effort at restitution. Although the Special Master found that Tuggle was willing to reimburse the client for her attorney fees for getting the default judgment set aside, the testimony the Special Master relied on does not support this finding. As noted above, Tuggle claimed he "would've been more than happy to reimburse" the client for her attorney fees but that he "was provided no documentation" of the fees and thus did not know their "exact amount." But it is undisputed that Tuggle himself actually submitted, as part of his hearing exhibits, the invoice documenting the client's legal fees. As far as we can tell, Tuggle has made no effort to make restitution in any amount to the client in SDBD No. 7212. So we conclude that Tuggle's indifference to restitution is an aggravating factor in SDBD No. 7212.

Finally, we conclude that Tuggle's substance-use disorders are not mitigating in either of the matters here. The ABA Standards provide that a "chemical dependency[,] including alcoholism or drug abuse" may be a mitigating factor when:

(1) there is medical evidence that the respondent is affected by a chemical dependency . . . ;

(2) the chemical dependency or mental disability caused the misconduct;

(3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and

(4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

ABA Standard 9.32 (i). Tuggle's substance-use disorders do not satisfy this ABA Standard for the simple reason that in neither case is there evidence that his "chemical dependency . . . caused the misconduct." In SDBD No, 7212, Tuggle testified that his Adderall addiction caused him to focus *too much* on his work; his disorder thus would offer no explanation for his untimely answer, failure to effectively open the default, and abrupt termination of the representation with no follow-up communication. And to the extent Tuggle attributed his failure to maintain communications with the client to the fact that he was occupied with his treatment and recovery, we note first that the record is unclear as to the timing of his treatment (see footnote 14 above) and also that, regardless—and

54

as the Special Master noted—"[Tuggle's] law office was open" and thus, whether in treatment or not, he remained obligated to his clients. As to SDBD No. 7402, the evidence is undisputed that Tuggle was not using Adderall at the time of his representation, and Tuggle testified without reservation that his alcohol-use disorder "[d]idn't have anything to do with" and "didn't affect my services whatsoever" in that case.[27]

On balance, the aggravating factors we have identified— pattern of misconduct; multiple rules violated; vulnerable clients; lack of remorse or acknowledgment of wrongdoing; failure to make any restitution in one case and failure to make full restitution in the other—substantially outweigh the mitigating factors—no prior discipline; no selfish motive; attestations of good character.

---

[27] In concluding that Tuggle's substance-use disorders are not mitigating here, we do not in any way intend to minimize Tuggle's efforts to confront his chemical dependency, which are to be applauded. We reiterate that our basis for concluding that his chemical dependency is not mitigating is that there is simply no evidence of a causal link between the dependency and the misconduct. We also note, however, that the evidence here does not establish Tuggle's full recovery from his alcohol-use disorder, so to the extent that disorder had been shown to be a cause of his misconduct, his less-than-full recovery might not have been a mitigating factor in any event.

(c) *Appropriate Level of Discipline*

To recap, the record before us establishes that Tuggle violated six provisions of the GRPC in two client matters. In both matters, among the rules violated is Rule 8.4 (a) (4), which is "among the most serious violations with which a lawyer can be charged." *In the Matter of McCall,* 314 Ga. 200, 206 (875 SE2d 765) (2022). Violation of that rule, along with three of the other rules violated, is punishable by disbarment. In our consideration of the factors relevant to assigning discipline, we have concluded that Tuggle violated the duties of competence, diligence, and candor, as well as his duties in communicating with clients, upon termination of his relationship with clients, and with respect to agreements conditioned on dismissal of disciplinary complaints. We have also determined that many of Tuggle's actions were committed with intent or at least knowledge; that he caused serious actual and potential injury to both clients; and that the aggravating factors significantly outweigh the mitigating factors in both matters.

On such a record, the recommendation of a one-month suspension is grossly inadequate. Neither the Special Master nor the Review Board cited a single case supporting this level of discipline, and our own research shows that such a short suspension is rare and certainly not sufficient discipline in circumstances like those here.[28]

Instead, for Tuggle's pattern of serious misconduct in violation of Rules 1.1, 1.3, 1.4 (a), 1.16 (d), 8.4 (a) (4), and 9.2 in these two matters, with a number of factors in aggravation that substantially outweigh any mitigating factors, a significant disciplinary sanction in the form of either a lengthy suspension with conditions or disbarment is warranted. Compare *In the Matter of Roberts*, 314 Ga.

---

[28] We have imposed a one-month suspension as reciprocal discipline, see *In the Matter of Bounds*, 294 Ga. 724 (755 SE2d 745) (2014), and in a few cases involving far less egregious circumstances. See *In the Matter of Branan*, 300 Ga. 779 (798 SE2d 218) (2017) (imposing one-month suspension and Review Panel reprimand for single act of misconduct involving no harm to clients, where no aggravating factors were present and several mitigating factors were); *In the Matter of Wilkinson*, 284 Ga. 548 (668 SE2d 707) (2008) (imposing one-month suspension and public reprimand for negligent misconduct involving no finding of harm to clients, where no aggravating factors were presented and several mitigating factors were).

510 (877 SE2d 266) (2022) (disbarring attorney with no prior disciplinary record for multiple rule violations in two client matters where attorney failed to respond to filings and appear at court hearings and failed to communicate and consult with clients to the substantial detriment of both clients, where attorney refused to acknowledge wrongful conduct and showed indifference to making restitution); *In the Matter of Holliday*, 308 Ga. 216 (839 SE2d 518) (2020) (disbarring attorney with no prior disciplinary record for multiple rule violations in three client matters where attorney effectively abandoned clients' cases and failed to communicate with clients, to their detriment); and *In the Matter of Koehler*, 297 Ga. 794 (778 SE2d 218) (2015) (disbarring attorney with no prior disciplinary record for multiple rule violations in a single client matter in which, among other aggravating factors, attorney failed to acknowledge his wrongful conduct when numerous aggravating factors were present), with *In the Matter of Iwu*, 303 Ga. 539 (813 SE2d 336) (2018) (imposing three-year suspension on attorney with no disciplinary record for multiple rule violations where aggravating

59

factors outweighed mitigating factors); and *In the Matter of Lea*, 296 Ga. 79 (764 SE2d 859) (2014) (imposing three-year suspension with reinstatement conditions on attorney with no disciplinary record where attorney abandoned two clients and failed to make restitution).

In determining the appropriate discipline, it will be useful to have the benefit of fact-finding on the post-hearing developments in the malpractice suit arising from the matter in SDBD No. 7212, referenced in footnote 12 above. The disposition of that suit, as well as Tuggle's conduct in those proceedings, may be relevant in determining the proper level of discipline to impose. We have therefore concluded that it is necessary to remand this case for additional fact-finding as to those post-hearing developments. See *In the Matter of Van Dyke*, 311 Ga. 199 (857 SE2d 194) (2021) (remanding to special master for additional fact-finding as to matters addressed in supplemental briefing, among other things). In addition, because restitution is at issue in both matters and may be relevant to Tuggle's reinstatement after any suspension we may

ultimately impose, additional fact-finding is necessary as to the amount of restitution (including unpaid judgments, attorney fees, and any other amounts) the Bar contends is still owed to the client-grievants.

We therefore reject the recommendations of the Review Board and the Special Master and remand to the Board, with direction that the Board remand this case to a Special Master, within ten days of the publication of this opinion, for (1) further fact-finding on the limited subjects of the post-hearing developments in the malpractice suit arising from the matter in SDBD No. 7212 and the amount of restitution, if any, that is currently owed to the client-grievants in both matters; and (2) a new recommendation as to the appropriate discipline to be imposed, consistent with the findings and conclusions in this opinion and informed by the Special Master's additional fact-finding on the two issues outlined above. The Special Master is directed to submit an amended report and recommendation with additional findings of fact and conclusions of

law, and a new recommendation, within 90 days of the date of the Review Board's order remanding the case.

*Review Board recommendation rejected and case remanded with direction. All the Justices concur.*

Decided September 6, 2023.

Disciplinary matter.

*Paula J. Frederick, General Counsel State Bar, William D. NeSmith III, Deputy General Counsel State Bar, Jenny K. Mittelman, Andreea N. Morrison, Assistant General Counsel State Bar*, for State Bar of Georgia.

*Wilson Morton & Downs, James E. Spence, Jr.*, for Tuggle.