318 Ga. 127
FINAL COPY

S23Y0807. IN THE MATTER OF CHRISTOPHER RYAN
BREAULT.

PER CURIAM.

This disciplinary matter is before the Court on the report and recommendation of the State Disciplinary Review Board ("Review Board"), recommending that the Court adopt the recommendation of Special Master Daniel S. Reinhardt that Christopher Ryan Breault (State Bar No. 207142), a member of the State Bar of Georgia since 2013, be suspended for a period of one month.[1] The conduct underlying this matter occurred while Breault was litigating a personal injury case in the United States District Court for the Southern District of Georgia, resulting in Breault being charged with violating Rules 1.1, 1.6 (a), 1.16 (a) (3), and 3.5 (d) of the Georgia Rules of Professional Conduct ("GRPC"), found in Bar Rule

---

[1] The Special Master recommended a suspension of 30 days, while the Review Board recommended a suspension of one month. Throughout this opinion, we refer to the recommended suspension as a one-month suspension, for consistency.

4-102 (d). The maximum penalty for a single violation of Rules 1.1 and 1.6 is disbarment, while the maximum penalty for a single violation of Rules 1.16 and 3.5 (d) is a public reprimand.

After carefully reviewing the record, we conclude that the Special Master failed to adequately analyze Breault's conduct under the framework found in the American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards"), a framework that though not controlling, is "generally instructive as to the question of punishment." *In the Matter of Cook*, 311 Ga. 206, 213 (3) (a) (857 SE2d 212) (2021). Thus, we decline to determine at this juncture whether a one-month suspension is an appropriate sanction for Breault's conduct. We reject the recommendations below and remand the case to the Review Board, with direction to remand the case to a Special Master to conduct a full analysis of Breault's conduct under the helpful ABA Standards and to issue a new recommendation consistent with this opinion. At this stage, we do not decide whether the Special Master and Review Board correctly concluded that Breault violated the provisions of the GRPC with

which he was charged, nor do we decide Breault's exceptions to these conclusions.

1. *Procedural History*

This matter was referred to the State Bar by a federal district court, which held a disciplinary hearing regarding the conduct of Breault and his co-counsel during the personal injury case. The district court issued a sealed order disciplining Breault and his co-counsel, and it sent the order to the State Bar. In subsequent orders, the district court granted the State Bar permission to disclose the sealed disciplinary order to individuals aiding in the investigation and potential prosecution of disciplinary matters involving Breault, and allowed the State Bar to access related pleadings, exhibits, transcripts, and orders from the district court proceedings. In pertinent part, the district court concluded in the sealed disciplinary order that Breault had violated Rules 1.1, 1.3, 1.6, and 1.16 of the GRPC, and disciplined Breault by revoking his pro hac vice admission and ordering that he could reapply for admission to practice in the Southern District after six months, conditioned upon

his completion of at least 30 continuing legal education credits in ethics.[2]

On January 11, 2019, the State Disciplinary Board found probable cause to file a formal complaint against Breault for violating Rules 1.1, 1.6, 1.16, and 3.5 (d).[3] A formal complaint was filed on May 6, 2019, and a Special Master was appointed on May 7, 2019.[4] See Case No. S19B1185. On July 22, 2019, Breault filed a timely answer after being personally served with the notice of a finding of probable cause, the formal complaint, the petition for appointment of a Special Master, and the order appointing a Special Master. During litigation, the Special Master entered a protective order in an attempt to maintain compliance with the then-sealed

---

[2] The federal district court's discipline only governed Breault's ability to practice in *that court*. See *In the Matter of Stubbs*, 285 Ga. 702, 703-704 (681 SE2d 113) (2009) ("While the federal district court had authority to discipline or suspend [an attorney] from the practice of law *in its court* for misconduct or violation of its local rules . . . it has no authority to confer or revoke [the attorney's] license to practice law." (emphasis supplied)). This Court has the exclusive authority to determine whether Breault should be disciplined under the GRPC. See *Cook*, 311 Ga. at 213 (3) (a) ("The level of punishment imposed rests in the sound discretion of this Court.").

[3] Breault was also charged with violating Rule 1.3, but the State Bar later abandoned that charge.

[4] This Court appointed Special Master Reinhardt on November 10, 2020, after the original special master was no longer able to continue performing his duties.

district court orders. The Special Master held an evidentiary hearing on March 14, 2022, and entered his report and recommendation on October 17, 2022. Breault filed timely exceptions and requested review by the Review Board. The Review Board entered its report and recommendation on March 27, 2023, summarily adopting the Special Master's findings of fact and conclusions of law, and rejecting all of Breault's arguments.[5]

2. *The Special Master's Report and Recommendation*

(a) *The Facts*

The Special Master recounted that on October 14, 2015, a man from South Carolina was injured in an automobile accident in Savannah. The man and his wife hired a Georgia attorney, C. M., to represent them in the ensuing personal injury case. C. M. lacked

---

[5] When the matter was filed in this Court, the State Bar initially sought permission from this Court to file certain portions of the disciplinary record under seal to maintain compliance with the sealed district court orders and protective orders entered by the Special Master. This Court denied that motion without prejudice because the Bar had provided no authority for filing those records under seal. The State Bar ultimately sought and received an order from the district court allowing it to file those records in this Court with the name of Breault's co-counsel redacted therefrom. Accordingly, throughout this opinion, we refer to Breault's co-counsel by his initials, C. M.

experience in personal injury matters, so he associated a more experienced personal injury firm, which filed a lawsuit on behalf of the couple (collectively referred to as "clients," individually referred to as "husband" and "wife") in federal district court in Savannah in February 2016. C. M. formally appeared as counsel of record in September 2016. The personal injury firm completed the substantive work on the case, and the district court entered a pretrial order, setting trial to start on June 27, 2017. In May 2017, C. M. became dissatisfied with the personal injury firm because he believed that the husband had suffered a cognitive injury and thought that the personal injury firm had failed to fully develop evidence of damages. On the other hand, a partner from the personal injury firm believed that C. M. wanted to remove the firm from the case so that he could receive a larger percentage of any recoverable fee. With his clients' permission, C. M. terminated the services of the personal injury firm, and the partner filed a motion to withdraw on behalf of the firm, which was granted in June 2017.

In May 2017, C. M. associated his former law school classmate, Breault, on the case. Breault assumed the role of lead counsel knowing that the case was set for trial in June and that he only had one month to develop additional evidence. He filed an appearance, was admitted pro hac vice on June 5, 2017, and then immediately associated additional lawyers to assist with research, writing, and other legal work. Breault and C. M. decided that it was necessary to depose the husband's treating physician. On May 24, Breault contacted the physician's office and scheduled a deposition, which Breault later cancelled. On June 7, Breault and C. M. met with the physician at the physician's office, where, unbeknownst to Breault and the physician, C. M. recorded their conversation. On June 20, Breault called the physician's office manager about rescheduling the deposition for a date before the trial, indicating that he would have to subpoena the physician to appear in court if the deposition could not be scheduled. The physician agreed to give a deposition, which was set for June 23. Because of confusion arising from the scheduling of the deposition, defense counsel contacted the

7

physician's office and was told by the office manager that Breault had been threatening toward her. As a result, on June 21, the defendants filed a motion to revoke Breault's pro hac vice admission ("Defendants' Motion to Revoke"), arguing that he had violated provisions of the district court's guidelines for courtroom conduct with respect to his interactions with the office manager.

On June 22, Breault and C. M. filed a response brief in which they incorporated portions of the recorded conversation they had with the physician and attached a transcript of the conversation as an exhibit.[6] They also sent the audio recording of the conversation to the district court and defense counsel. It was undisputed that the transcript contained privileged information that Breault and C. M. gained in their professional relationship with the clients. Yet, the lawyers did not obtain the clients' permission to disclose that information by filing the transcript and the recording. Moreover, Breault and C. M. indicated in their response brief that while they

---

[6] Breault testified at the disciplinary hearing before the Special Master that C. M. and two other lawyers had agreed with Breault to include the transcript in their response to the Defendants' Motion to Revoke.

8

understood they were "tipping the 'playing field'" in favor of the defendants by disclosing work product via the recording and transcript, they felt that "the esteem and confidence of [the district court] [were] more important." Later at the disciplinary hearing before the Special Master, Breault admitted to making the disclosures public to make defense counsel look like "a disingenuous a\*\*hole." The district court denied the Defendants' Motion to Revoke after a hearing, but specifically found that the disclosure of the conversation was unnecessary and damaging to the plaintiffs' case.

In other orders, the district court allowed Breault and C. M. to add as a witness the neuropsychologist that the physician had previously recommended, extended the time for discovery, and postponed trial until October 30, 2017. The district court also ordered the parties to depose the neuropsychologist by mid-August to allow the defendants a fair opportunity to respond to his testimony. On July 20, Breault e-mailed defense counsel that the neuropsychologist's deposition would occur on the morning of August 14. On August 9, Breault responded to a defense inquiry

about the neuropsychologist's curriculum vitae, stating that the neuropsychologist could not appear for deposition on August 14. In reality, Breault had never confirmed the deposition date with the neuropsychologist. Breault advised defense counsel that he would file a request for more time to conduct the deposition, but he never did.

C. M. attempted to fire Breault on August 8, but he had not received the clients' permission to effectuate the firing. On August 16, 2017, C. M., with the clients' permission, terminated Breault's representation by letter, citing as a reason the difficulties with scheduling medical depositions. The Special Master noted that C. M. had been in contact with a well-known plaintiff's lawyer and that after Breault was terminated, that lawyer became lead counsel. Breault was upset by the termination, believed the real reason was to deprive him of a fee, and did not believe that the clients had approved the termination. On August 17, he appeared unannounced at the clients' home in South Carolina to try to remain on the case. The wife texted C. M., who told Breault over the telephone to leave.

10

As Breault later stated in his response to another filing, he then told the husband to seek advice from a litigation funding company before leaving the clients' home. After Breault left, the wife texted him confirming that he had been terminated. After receiving the text, Breault invited the wife to attend a "focus group" that he had purportedly scheduled for August 23, and indicated to the wife that he would file a notice of withdrawal the next day, but Breault failed to file the notice.

Because of Breault's failure to file a notice of withdrawal, on October 4, 2017, C. M. filed on behalf of the clients a motion to revoke Breault's pro hac vice admission ("Plaintiffs' Motion to Revoke"). In that motion and Breault's response thereto, C. M. and Breault accused each other of misconduct. Breault also included in his response privileged work-product and communications between himself and the clients concerning the admissibility and credibility of potential evidence. It was undisputed that these communications contained privileged information, which Breault disclosed by filing them with his response.

Based on these filings, the district court held a disciplinary hearing on October 30, 2017, instead of starting the trial as scheduled. Breault filed a notice of withdrawal on the same day. In its ruling at the end of the hearing, the district court found that the disclosures that Breault and C. M. had made in response to the Defendants' Motion to Revoke were damaging to their clients. According to the district court, these disclosures gave the defendants "a strategy for undermining the [plaintiffs'] case," and defense counsel testified that the disclosures gave him valuable cross-examination material against the plaintiffs' experts and suggested an easy roadmap to damage the clients' case.

(b) *Rules Violated*

The State Bar argued that Breault violated Rule 1.1[7] by filing a response to the Defendants' Motion to Revoke that violated Rule

---

[7] Rule 1.1 imposes the duty of competence on a lawyer representing a client, meaning that "a lawyer shall not handle a matter which the lawyer knows or should know to be beyond the lawyer's level of competence without associating another lawyer who the original lawyer reasonably believes to be competent to handle the matter in question."

1.6 (a),[8] and by advising the husband to seek advice from a litigation funding company. The Special Master rejected the first argument because he viewed the requirement of competence in Rule 1.1 "more broadly" and observed that even if a single violation of Rule 1.6 could also constitute a violation of Rule 1.1, Breault's background still qualified him to represent a client in a serious personal injury case arising from an automobile accident. The Special Master rejected the second argument because the State Bar had "not produced any expert opinion evidence" to support it.

Next, the Special Master noted that the State Bar had abandoned its claim that Breault had violated Rule 1.3,[9] and that the State Bar argued the misconduct underlying that alleged

---

[8] Rule 1.6 (a) provides, in relevant part, that "[a] lawyer shall maintain in confidence all information gained in the professional relationship with a client, including information which . . . would likely be detrimental to the client, unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation[.]"

[9] Rule 1.3 states: "A lawyer shall act with reasonable diligence and promptness in representing a client. Reasonable diligence as used in this rule means that a lawyer shall not without just cause to the detriment of the client in effect willfully abandon or willfully disregard a legal matter entrusted to the lawyer."

violation was part of a pattern of misconduct supporting a finding that Breault violated Rule 3.5 (d).[10]

The Special Master concluded that Breault violated Rule 3.5 (d) because, by failing to timely withdraw, he "effectively re-wrote the District Court's schedule with respect to his client[s'] case," which was unfair to the clients. The Special Master stated that Breault's explanation about "his decision not to withdraw and whether and when he finally believed that his services had been terminated strains belief."[11] Moreover, the Special Master found that Breault violated Rule 3.5 (d) by failing to schedule and take the neuropsychologist's deposition by mid-August as ordered by the district court. At the disciplinary hearing, Breault had testified that the neuropsychologist was busy and non-responsive. But if scheduling the deposition was difficult, the Special Master

---

[10] Rule 3.5 (d) provides that "[a] lawyer shall not, without regard to whether the lawyer represents a client in the matter . . . engage in conduct intended to disrupt a tribunal."

[11] Here, the Special Master referenced a transcript from the district court, which does not appear to be in the record before this Court. It is unclear how Breault explained his actions to the district court.

explained, Breault could have issued a subpoena, contacted the district court, or filed a motion for an extension of the time for discovery — none of which occurred. Also, the Special Master found that Breault disrupted the litigation process by giving "opposing counsel unequivocal factual information about the date and time of a scheduled deposition" even though Breault never got the neuropsychologist to firmly agree to that date. Finally, the Special Master pointed to Breault's failure to seek an extension of time to take the deposition despite his promise to opposing counsel that he would do so.[12]

As for Rule 1.6 (a), the Special Master found a violation in two ways. First, the Special Master noted that Breault disclosed the transcript and recording of the conversation with the physician in response to the Defendants' Motion to Revoke — which the defendants filed due to Breault's phone interactions with the physician's office manager. The Special Master noted that while

---

[12] The Special Master does acknowledge that Breault could no longer reschedule a deposition after August 16 because that was the date on which he was terminated.

disclosing the recording helped Breault defeat the motion since the recording lacked evidence of Breault using aggressive tactics toward the physician, no one disputed that the recording contained privileged information. The Special Master also stated that he believed that if the physician had been deposed, "most of the facts disclosed in the recording would have been forthcoming based on [the physician's] records alone." Nonetheless, the Special Master reiterated that it was improper to disclose that information without the clients' consent.

Breault contended that the disclosure was strategic because it changed the case from an orthopedic case to a case with a brain injury component. And, Breault pointed out, the district court denied the Defendants' Motion to Revoke, and the decision to disclose the conversation was made by all of the clients' attorneys, including C. M. The Special Master rejected this argument, reasoning that there were ways to defeat the motion without disclosing the privileged information in the transcript and recording, such as using redaction or asking the district court to

16

conduct an in camera review. The Special Master found that Breault sought neither of these remedies and disclosed the information without his client's permission. And, the Special Master indicated that Breault's testimony showed he had disclosed privileged information in order to show that defense counsel was a "disingenuous a\*\*hole."

Second, the Special Master found that Breault violated Rule 1.6 by disclosing privileged information in response to Plaintiffs' Motion to Revoke his pro hac vice status, which the plaintiffs filed after Breault failed to withdraw. The Special Master found that Breault's disclosure of privileged information here was designed solely to further his own interests and did not benefit his former clients.

As for Rule 1.16 (a) (3),[13] the Special Master found Breault in violation by failing to timely move to withdraw as he said he would. The Special Master recounted that C. M. delivered a termination

---

[13] Rule 1.16 (a) (3) provides that a lawyer "shall withdraw from the representation of a client if . . . the lawyer is discharged."

17

letter to Breault on August 16; Breault appeared unannounced on August 17 at the house of the clients, who told him that they did intend to terminate his representation; and despite indicating that he would withdraw the next day on August 18, Breault failed to file a motion to withdraw until his disciplinary hearing before the district court on October 30.

(c) *Recommendation of Discipline*

In evaluating discipline, the Special Master did not analyze three components of the ABA Standards: (1) the duty violated, (2) the lawyer's mental state, and (3) the actual or potential injury to the clients. See *In the Matter of Morse*, 265 Ga. 353, 354 (2) (456 SE2d 52) (1995), superseded on other grounds by Rule as stated in *Cook*, 311 Ga. at 207-208 (1). Instead, he analyzed only the applicable aggravating and mitigating factors. In aggravation, the Special Master found that Breault had not acknowledged the wrongful nature of his conduct or the personal nature of his actions. The Special Master did not deem the case to involve a pattern of misconduct because "[a]lthough there are multiple offenses, they all

18

arise in one representation." In mitigation, the Special Master found that Breault had no prior disciplinary offenses and that he was inexperienced in the practice of law because he had only been practicing for four years when his misconduct occurred. The Special Master then indicated that he found the other aggravating and mitigating factors as listed in the ABA Standards to be inapplicable. Throughout his report and recommendation, the Special Master also commented that: (1) the clients were not harmed financially and that Breault did not steal money from them, but that (2) Breault was angry about how C. M. treated him and how his work would go unrewarded, and he let his anger drive and cloud his actions.[14] The Special Master recommended that Breault be suspended from the practice of law for one month without conditions for reinstatement. The Special Master did not cite any case law supporting a one-month suspension as the appropriate form of discipline.

---

[14] It is unclear whether the Special Master's comments on anger and the lack of stealing and financial harm factored into his recommendation of discipline, and whether or where he intended them to fit into the ABA Standards analysis. However, we mention these comments because the next Special Master may or may not elect to analyze these comments on remand.

3. *Review Board's Report and Recommendation*

Breault sought review by the Review Board, arguing that the Special Master erred by recommending a one-month suspension because clear and convincing evidence was not presented that Breault violated any provision of the GRPC. The State Bar responded that the Special Master's recommendation of a one-month suspension was appropriate.

The Review Board affirmed the Special Master's factual findings, legal conclusions, and recommendation of discipline. First, it did not find clear error in the Special Master's factual findings, and adopted those findings and incorporated them by reference. Next, the Review Board did not find error in the Special Master's conclusions of law and adopted them, stating that it weighed all of Breault's arguments, including Breault's argument that his conduct was excused by Rule 1.6 (b) (1) (iii).[15] According to the Review Board,

[15] Rule 1.6 (b) (1) (iii) provides that a lawyer "may reveal information covered by paragraph (a) which the lawyer reasonably believes necessary . . . to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer

20

Breault argued that Rule 1.6's exceptions excused his disclosure of confidential client information and that his violation of Rule 1.6 ultimately benefitted the client. The Review Board found these arguments unavailing, concluding that "[w]hether a violation of the Rules ultimately leads to a benefit to a client does not excuse the underlying violation," particularly when Breault would not have violated Rule 1.6 if he had obtained informed consent from the clients before disclosing the privileged information. The Review Board observed that Breault used Comment 16 to Rule 1.6[16] to argue that unlimited disclosure is permitted any time a lawyer is accused of violating the law. The Review Board rejected this argument, too,

based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client[.]"

[16] Comment 16 to Rule 1.6 provides, in relevant part:

Where a legal claim or disciplinary charge alleges . . . misconduct of the lawyer involving representation of the client, the lawyer may respond to the extent the lawyer reasonably believes necessary to establish a defense. . . . In any event, disclosure should be no greater than the lawyer reasonably believes is necessary to vindicate innocence, the disclosure should be made in a manner which limits access to the information to the tribunal or other persons having a need to know it, and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable.

reasoning that Breault had ways to respond to the motions to revoke while reasonably safeguarding the clients' privileged information.

The Review Board stated that it was adopting the Special Master's analysis of the ABA Standards as to the duties violated, Breault's mental state, the potential or actual injury caused by Breault's misconduct,[17] and the aggravating and mitigating factors.[18] The Review Board recommended that this Court suspend Breault from the practice of law for one month with no conditions for reinstatement.[19]

4. *Analysis*

"The primary purpose of a disciplinary action is to protect the public from attorneys who are not qualified to practice law due to

---

[17] The Review Board did not address the Special Master's lack of analysis on duty, mental state, and potential or actual injury.

[18] The Review Board then discussed several aspects of Breault's unprofessional conduct in the proceedings before it, but because much evidence of that alleged conduct is not in the disciplinary record and because the Board did not clearly tie its professionalism discussion to its recommendation of discipline, we do not consider it for the purposes of this opinion.

[19] Though the Review Board mentioned the ABA Standards and case law on the factors that should be considered in determining an appropriate sanction, it did not cite any authority to support imposing a one-month suspension.

incompetence or unprofessional conduct, but this Court is also concerned with the public's confidence in the profession generally." *Cook*, 311 Ga. at 213 (3) (a). The sanction imposed for disciplinary infractions should be one that is sufficient to penalize the offender for his wrongdoing, deter other attorneys from engaging in similar behavior, and inform the general public that the courts will maintain the ethics of the profession. See id. The ABA Standards are "generally instructive as to the question of punishment," though "they are not controlling." Id. See also *In the Matter of Hunt*, 304 Ga. 635, 640 (820 SE2d 716) (2018) ("[T]his Court relies on the [ABA Standards] for general guidance in determining the appropriate level of discipline."); *In the Matter of Morse*, 266 Ga. 652, 653 (470 SE2d 232) (1996) ("[W]e look to the American Bar Association's standards for guidance in determining the appropriate sanction to impose."). Ultimately, "the level of punishment imposed rests in the sound discretion of this Court." *Cook*, 311 Ga. at 213 (3) (a).

(a) *ABA Standards*

To properly determine the appropriate sanction for attorney discipline, the Special Master "should look to the [ABA Standards] for guidance." *Morse*, 265 Ga. at 354 (2) (remanding case to review panel to consider the disciplinary matter under the ABA Standards). As we have repeatedly indicated in our prior decisions, those standards offer several factors for consideration in imposing discipline: "the duty violated; the lawyer's mental state; the actual or potential injury caused by the lawyer's misconduct; and the existence of aggravating or mitigating factors." *Cook*, 311 Ga. at 210 (2). See also *Morse*, 265 Ga. at 354 (2); ABA Standards at II & III.C.3.0.

Here, although the Special Master discussed aggravating and mitigating factors, he did not first analyze the duty violated, the lawyer's mental state, and any actual or potential injury. Thus, we refrain at this point from deciding what sanctions are appropriate, if any, and remand the case for a full analysis of the ABA Standards

24

consistent with our discussion below. That analysis, in turn, may affect the recommendation of discipline.

(b) *Duty Violated*

The GRPC prescribes duties for attorneys authorized to practice law in Georgia. See, e.g., *In the Matter of Tuggle*, 317 Ga. 255, 271 (6) (a) (892 SE2d 761) (2023) (concluding that an attorney "violated his duty of competence, *as prescribed in* Rule 1.1," his "duty of diligence, *as prescribed in* Rule 1.3," and "his duties upon termination of representation, *as prescribed in* Rule 1.16 (d)" (emphasis supplied)); *In the Matter of Skinner*, 292 Ga. 640, 641 (740 SE2d 171) (2013) ("Rule 1.6 of the [GRPC] *requires* a lawyer to maintain in confidence all information gained in the professional relationship with a client" subject to certain exceptions (emphasis supplied)).

The ABA Standards — though themselves not controlling, see *Cook*, 311 Ga. at 213 (3) (a) — assist the Court in its determination of sanctions by providing a non-exhaustive list of the duties explicitly or implicitly prescribed by the GRPC and by grouping

25

those duties into several categories: duties that a lawyer owes to his clients; duties that he owes to the general public; duties he owes to the legal system; and duties he owes to the legal profession. See ABA Standards at II & III.C.4.0-7.0. On remand, the Special Master should consider which of these duties Breault may have violated by his violations, if any, of the GRPC.

For example, the Special Master should consider the duty of loyalty owed by a lawyer to a client, which includes the duty to maintain client confidences. See Rule 1.6 (a); ABA Standards at II. Rule 1.6 safeguards these duties by requiring a lawyer to obtain informed consent before disclosing a client's confidential information, subject to certain exceptions. These exceptions include Rule 1.6 (a), whereby a lawyer may disclose confidential client information that he is "impliedly authorized [to disclose] in order to carry out the representation," and Rule 1.6 (b) (1) (iii), whereby a lawyer may disclose the client's confidential information that he "reasonably believes [is] necessary" to defend himself against criminal or civil claims based on his representation of the client.

Here, the duty to maintain client confidences, as part of a duty of loyalty to a client, was implicated by Breault's disclosure of confidential client-related information in response to two motions to revoke his pro hac vice status in the district court. Breault argued that he was impliedly authorized to disclose the information under Rule 1.6 (a), and that he reasonably believed that disclosing the information was necessary to defend himself against civil or criminal claims under Rule 1.6 (b) (1) (iii). On remand, the Special Master should explicitly address these Rule 1.6 exceptions in determining whether Breault violated Rule 1.6, and if he did, state whether in doing so Breault violated the duty to maintain client confidences and a duty of loyalty to the client.

The Special Master should also consider whether Breault violated a lawyer's duty to the legal system. Here, Breault's duty to the legal system to refrain from improper conduct was implicated by the Special Master's conclusion that he violated Rule 3.5 (d) by disrupting the district court proceedings on two occasions. The Special Master should consider whether Breault violated this duty.

In addition, lawyers owe duties to the legal profession, including a duty to properly terminate representation of a client. This duty was implicated by the Special Master's conclusion that Breault violated Rule 1.16 (a) (3) when he failed to promptly withdraw from representing the clients. The Special Master should consider whether Breault violated this duty.

We recognize that sometimes it may be apparent, even without explicit explanation, which duty or duties were violated (and *that* a duty was violated) by a Rules violation. For example, a violation of Rule 1.6 (a)'s requirement that a lawyer "maintain in confidence all information gained in the professional relationship with a client [subject to exceptions]," will, likely in every case, be a violation of the "duty" to maintain client confidences and "duty" of loyalty owed to the client. But even if so, it is often helpful for this Court's determination of discipline when a Special Master explicitly uses the framework of duty — that is, when a Special Master, for every Rule that he or she deems violated, discusses whether that Rule violation entails a violation of a duty to the client, to the general public, to the

28

legal system, to the legal profession, or to a combination thereof. Thus, to assist our determination of discipline, we ask the Special Master on remand — and encourage Special Masters in general — to use the framework of duty, even though the ABA Standards, again, are not controlling. See *Cook*, 311 Ga. at 213 (3) (a).

(c) *Mental State*

The ABA Standards also provide helpful, albeit non-binding, definitions of three mental states: intent, knowledge, and negligence. See ABA Standards at III (Definitions); *Tuggle*, 317 Ga. at 273-274 (6) (b) (analyzing lawyer's mental state through the categories of intent, knowledge, and negligence). A lawyer acts with intent — the most culpable mental state — when he acts with the "conscious objective or purpose to accomplish a particular result." ABA Standards at III. A lawyer acts with knowledge when he acts with "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." Id. And a lawyer acts with negligence — the "least culpable mental state" — when a lawyer

29

"fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." Id. at II.

Here, although the Special Master found that Breault's actions were "clouded by anger," he made no explicit findings as to Breault's mental state as the ABA Standards define that term. That makes it difficult for this Court to determine appropriate discipline. Thus, to aid our determination of discipline in this case, the Special Master on remand should consider, based on the record, which mental state(s) Breault acted with when he committed the Rules violations, if any. Potential starting points in the record as to Breault's mental state in relation to Rule 1.6 include Breault's testimony at the disciplinary hearing that he "purposefully" filed the transcript of the conversation with the physician as part of a "brilliant grand strategy," and his acknowledgement in his response to the Defendants' Motion to Revoke that by making the disclosure, he was "tipping the 'playing field'" in favor of the defendants.

30

(d) *Potential or Actual Injury*

An analysis of actual or potential injury to a client is a helpful factor for this Court to consider in ultimately determining what sanction is appropriate for a lawyer's violations of the GRPC, so the Special Master should explicitly consider the actual or potential injury suffered by the client. The ABA Standards define "[p]otential injury" to include "harm to a client . . . that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." ABA Standards at III (Definitions).

Here, the Special Master found that Breault's clients were "not financially hurt," that Breault "did not steal money," that "no one raised the issue of improper disclosure" at various proceedings before the district court, and that if the physician had been deposed, most of the matters disclosed in the recording would have been "forthcoming" based only on the physician's records. But the Special Master did not explicitly link any of these findings to a discussion of actual or potential injury, and the Review Board purported to adopt

31

the Special Master's findings on injury even though the Special Master had made no explicit findings.

However, the record contains evidence suggesting that Breault's disclosures in response to both of the motions to revoke, may have resulted in actual or potential injury to his clients. For example, in its ruling on the Defendants' Motion to Revoke, the district court found that Breault's disclosures damaged the plaintiffs' case, and that defense counsel testified that the recording of the conversation with the physician gave the defense valuable cross-examination material against the plaintiffs' experts. And Breault's response to the Plaintiffs' Motion to Revoke could have damaged the clients' case by disclosing information on the credibility and admissibility of potential plaintiff evidence. On remand, taking into account facts such as these and the record as a whole, the Special Master should consider whether any of Breault's misconduct caused actual or potential injury to the clients.

(e) *Aggravating and Mitigating Circumstances*

After determining the appropriate sanction based on his findings as to duties violated, mental state, and injury, the Special Master should turn to the aggravating and mitigating circumstances to determine whether the balance of those factors warrants a departure from the appropriate sanction. See ABA Standards at II ("[A]fter making the initial determination as to the appropriate sanction, the court would then consider any relevant aggravating or mitigating factors."). The ABA Standards define aggravation as "any considerations or factors that may justify an increase in the degree of discipline to be imposed," and mitigation as "any considerations or factors that may justify a reduction in the degree of discipline to be imposed." Id. at III.C.9.21 & C.9.31.

Here, the Special Master considered some aggravating and mitigating factors and found that in aggravation, Breault refused to acknowledge the wrongful nature of his conduct. See ABA Standards at III.C.9.22 (g). The Special Master specifically declined to apply the aggravating factor of a pattern of misconduct. See id. at

III.C.9.22 (c). In mitigation, the Special Master found only that Breault did not have a prior disciplinary record and he was inexperienced in the practice of law. See id. at III.C.9.32 (a) & (f).

On remand, the Special Master should reconsider the application and balance of aggravating and mitigating factors after and in light of his analysis of duty, mental state, and injury. See ABA Standards at II. In other words, the Special Master should first determine an appropriate sanction based on these three elements, and then determine what aggravating and mitigating factors exist and whether their balance calls for an upward or downward departure from the appropriate sanction.

5. *Conclusion*

Having reviewed the record, we conclude that the Special Master erred by failing to conduct a full analysis of the ABA Standards before recommending that Breault receive a one-month suspension, and the Review Board erred by adopting the Special Master's recommendation. We therefore reject the Recommendations of the Review Board and the Special Master and

remand to the Board, with direction that the Board remand this case to a Special Master, within ten business days of the publication of this opinion, for (1) a full analysis of the ABA Standards, including (a) the duties violated,[20] (b) Breault's mental state, (c) the potential or actual injury caused by Breault's misconduct, and (d) any aggravating or mitigating factors that might justify an upward or downward departure from the appropriate sanction; and (2) in light of this analysis and the record, a new recommendation as to the appropriate discipline to be imposed, consistent with the framework outlined in this opinion. The Special Master is directed to submit an amended report and recommendation with additional findings of fact and conclusions of law, and a new recommendation, within 90 days of the date of the Review Board's order remanding the case. After the Special Master submits the amended report and

---

[20] Before the Special Master assesses whether Breault violated the duty of loyalty and duty to maintain client confidences by violating Rule 1.6, the Special Master should first analyze the two exceptions to Rule 1.6 raised by Breault and mentioned earlier in this opinion, to determine whether Breault violated Rule 1.6 at all.

recommendation, both the State Bar and Breault may, if they so desire, file exceptions with the Review Board.

*Recommendation rejected and matter remanded with direction. All the Justices concur.*

Decided January 17, 2024.

Disciplinary matter.

*Paula J. Frederick, General Counsel State Bar, William D. NeSmith III, Deputy General Counsel State Bar, Jenny K. Mittelman, William V. Hearnburg, Jr., Assistant General Counsel State Bar*, for State Bar of Georgia.