319 Ga. 197
FINAL COPY

S23Y1195. IN THE MATTER OF DIANA Y. McDONALD.

PER CURIAM.

This disciplinary matter is before the Court on the Report and Recommendation of the State Disciplinary Review Board, which recommends that we adopt the Report and Recommendation of Special Master Delia T. Crouch. The Special Master recommended disbarring Respondent Diana Y. McDonald (State Bar No. 489710) for violations of Rules 1.5 (a); 1.8 (e); 1.15 (I) (a), (c), and (d); 1.15 (II) (a) and (b); 4.1 (a); 7.1 (a); 7.5 (a) and (d); and 8.4 (a) (4) of the Georgia Rules of Professional Conduct ("GRPC"), see Bar Rule 4-102 (d).[1] McDonald filed general exceptions to the Review Board's Report and Recommendation, arguing that disbarment is not the appropriate discipline. She also filed a document styled as a "Petition for

---

[1] The maximum penalty for a single violation of Rules 1.5 (a); 1.8 (e); and 7.5 (a) and (d) is a public reprimand, while the maximum penalty for a single violation of Rules 1.15 (I) (a), (c), and (d); 1.15 (II) (a) and (b); 4.1 (a); and 7.1 (a) and 8.4 (a) (4) is disbarment.

Voluntary Retirement," in which she requests that she be "transferred to retired status" in lieu of being disbarred. The Bar responded to both filings. After consideration of the entire record in this matter, we dismiss McDonald's petition for voluntary discipline and order that she be disbarred for her violations of the Georgia Rules of Professional Conduct.

*Factual Summary*

Although the record in this case is large and comprehensive, the general facts are that McDonald, a solo practitioner who joined the State Bar of Georgia in 1985, did business both as the McDonald Law Group, LLC, and Law Offices of Diana McDonald, LLC.[2] She maintained IOLTA accounts at Wells Fargo Bank in the names of both businesses.

In the course of her practice, McDonald provided legal advice to a client who purported to conduct deals wherein the client was to

---

[2] McDonald admitted that she identified her firm as a "law group," even though she was a solo practitioner. She testified that, at one point, another attorney had practiced with her, but that attorney left the firm in 2018. She continued practicing as a "law group" through the events leading to this disciplinary matter, which occurred in 2019.

provide goods or services to third parties in exchange for payment. As early as 2017, McDonald agreed to act and did act as an escrow agent for several of those deals. Despite the facts that none of the client's deals seemed to close smoothly and that the third parties in most, if not all, of those deals complained to McDonald about not receiving the promised goods or services, McDonald again agreed in early 2019 to act as the escrow agent in a deal wherein her client and his associate promised to sell 1,000 Bitcoin to a third party through intermediary companies.[3]

On January 3, 2019, the third party in this deal transferred $4,000,000 into one of McDonald's IOLTA accounts with the understanding that it would be held in escrow and not released until the promised Bitcoin was confirmed to be in the third party's "digital wallet" — an event which all parties expected to occur quickly, but which all parties now agree never happened. Several days later, after no Bitcoin was delivered, the third party, through its attorney,

---

[3] The agreement appeared to contemplate the exchange of up to 1,500 Bitcoin in several tranches, with the first tranche of 1,000 Bitcoin to be delivered on January 4, 2019.

3

reached out via e-mail to McDonald, demanding return of its funds. In responding to the third party over the next several days, McDonald first encouraged it to provide her client with additional time to deliver the Bitcoin, assuring the third party that her past experiences with her client gave her faith that her client would deliver, but that, if he did not do so, she would commence the process of transferring the third party's escrowed funds back to it on January 8, 2019.

Then, on January 9, 2019, after the third party again demanded return of its $4,000,000, McDonald informed the third party that she had received confirmation from her client that the Bitcoin would be delivered "before the end of business today"; represented that, "[a]s a gesture of good faith and recognition for the delay," she had negotiated with her client to deliver 2,000 Bitcoin, instead of the 1,000 for which the third party had paid; and assured the third party that its funds were "safe and protected." In mid-January, the State Bar became involved at the third party's request in trying to obtain assurances from McDonald that she still had the

4

$4,000,000 in her IOLTA account. McDonald advised the Bar that her client represented to her that he had sent the Bitcoin, and that he needed time to investigate why the Bitcoin had not shown up in the third party's digital wallet. She assured the Bar that the matter would be resolved by the end of the business day on January 15 and that "the funds [we]re safe." The Bar responded to McDonald informing her that it was relieved to hear that "the money was still safely in [her] trust account," and reminding her of her fiduciary duties under Rule 1.15 (I).[4]

On January 18, 2019, the third party filed a formal grievance against McDonald with the Bar, and the Bar forwarded it to her by e-mail, asking directly whether the $4,000,000 was still in her IOLTA account.[5] McDonald did not respond to the Bar's e-mail, but,

---

[4] McDonald took no steps to correct the Bar's mistaken belief that the funds were still in her trust account. She later admitted that she did not do so because she did not want to lie to the Bar and knew that if she told the truth, things would "kind of blow up."

[5] That grievance led to the issuance of a Formal Complaint, see Bar Rule 4-211, which was properly served on McDonald and timely answered by her. After a lengthy discovery period, the Bar moved for summary judgment, which was granted as to the violations still at issue in this matter. A hearing on

on January 18, she wired $2,000,000 to the third party. The rest of the money, however, would not be transferred because, as it turns out, McDonald had begun transferring the third party's money out of her IOLTA account to different recipients on the same day she received it. By January 7, when she assured the third party that its funds were "safe and protected," she had already disbursed approximately $2,000,000 of the third party's funds out of her IOLTA account to herself and others unaffiliated with this transaction. In fact, although the third party never authorized the transfer or disbursement of any of its funds except upon conclusion of the deal, and although McDonald never notified the third party of her intention to transfer any of its money out of her account, on January 3 and 4, McDonald transferred $415,000 to other accounts controlled by her; $25,000 to her sister; and $450,000 to parties involved in her client's earlier deals. In addition, she attempted to wire $1,200,000 to a Chinese bank, but those wires were not

aggravating and mitigating factors was held, after which the Special Master entered the Report and Recommendation addressed herein.

accepted. On January 7, the same day she assured the third party's attorney that the money was "safe and protected," she wired $800,000 to a corporation her client allegedly told her was its U.S. Bitcoin trader. McDonald asserted, during the underlying Bar proceedings, that each of these disbursements of the third party's money to herself and other individuals and companies was authorized by her client. On February 1, 2019, less than a month after it received the $2,000,000 back from McDonald, the third party demanded an accounting of its remaining funds being held in escrow, but she never provided that accounting.

Unsatisfied with the return of only half of its money, the third party filed a federal lawsuit against McDonald, her business entities, and various other parties on March 1, 2019, seeking an immediate temporary restraining order, injunctive and equitable relief, and compensatory and punitive damages. In connection with this lawsuit, McDonald provided sworn testimony in which she admitted that $440,000 of the third party's money had already been transferred to her operating accounts and to her personal accounts

(and that of her sister), and explained her position that, even though her client never provided, and the third party never received, any Bitcoin, she was entitled to those funds and more, as fees for her services to her client. She also took the position that she did not need the third party's permission to distribute its funds to herself or any other entity, because she was doing so at her client's direction and for his benefit. Further, McDonald told the federal court that she intended to keep the fees if the court allowed her to do so.

But when the federal court determined that McDonald still had $310,000 left in two of her Wells Fargo IOLTA accounts, the court directed her to transfer that amount back to the third party (which she did), and the court issued an order restraining any future transfer or spending of any money that was part of the third party's $4,000,000. Later, it became clear that McDonald was continuing to use the third party's money to operate her business, so the federal court ordered McDonald to deposit all monies in any of her accounts that could be traced back to the third party's $4,000,000 into the registry of the court. As a result, $104,200 was put into the court's

8

registry and eventually returned to the third party. So, in the end, the third party only recovered $2,414,200 of its $4,000,000 from McDonald, with the remaining $1,585,800 having been retained by McDonald and her family ($335,800) or paid out to various third parties seemingly unrelated to this Bitcoin transaction ($1,250,000). It appears that more than $400,000 of the third party's money was used to repay amounts McDonald owed to individuals or entities who had previously deposited money into her IOLTA account to be held in escrow in connection with her client's earlier "deals," but whose funds had been distributed from her escrow account (in violation of escrow agreements) despite the fact that the earlier "deals" had never closed.

From the third party's funds that she retained, McDonald admitted that she repaid money owed to friends and family, made loans to other friends, contributed to charity, paid bills, and purchased goods and services for herself and her businesses. Some of these payments were made after the third party demanded return of its money. In one notable instance, on January 7, 2019, McDonald

9

paid $5,644 to a bankruptcy trustee on behalf of an individual who was McDonald's client in a bankruptcy matter. McDonald explained that she did so because that bankruptcy client did not have the money needed to make her Chapter 13 bankruptcy payment; that she considered the payment a loan to a friend; and that she made an additional $3,000 loan to that client on January 16, 2019, because "she [was] a personal friend . . . and a client."

In addition, McDonald admitted that she paid approximately $11,650 to the trustee of the Chapter 13 proceeding of her husband. And, on March 6, 2019, McDonald used $90,000 of the third party's money to pay a retainer to an attorney, who initially represented her in the third party's federal lawsuit against her.[6] McDonald admitted that virtually all of the money she transferred to herself, her family members, and her friends during January and February 2019 could

---

[6] After it became clear that the third party's money was the source of that attorney's retainer, the attorney alerted the parties to the federal suit and those parties reached an agreement on March 25, 2019, pursuant to which the attorney would return $60,000 of the retainer to the third party and keep the remaining $30,000 to cover his defense of McDonald in the federal case to that point. The attorney withdrew as McDonald's attorney in April 2019.

be traced back to the third party's $4,000,000, but she asserted that she was entitled to use that money because she was owed fees from her client.[7]

During the disciplinary matter, McDonald finally admitted that, in hindsight, the third party was the owner of the $4,000,000; that she had received the money into her escrow account in a "fiduciary capacity"; that the third party's money was in her "protective care"; that she owed a fiduciary duty to the third party with regard to the funds on deposit with her; and that she "probably" knew as early as January 5, 2019, that the third party expected or understood that she was supposed to hold the money until the Bitcoin had been delivered. She further agreed that the third party's control of the money never terminated because performance of the agreed-upon conditions never happened; that all of the money should have gone back to the third party as the deal never closed; that she performed essentially no legal services beyond holding the

---

[7] Even in 2020, McDonald was still claiming that she was entitled to retain more than $200,000 of the third party's money as fees for her services.

11

funds in her IOLTA account; that she was not authorized by the third party to collect any fees or make any disbursements from its funds, at least until the deal was consummated; and that she did not advise anyone affiliated with the third party entity (or ask anyone there for permission) before she distributed its money.

McDonald further admitted that she did not keep or maintain a ledger or record of her IOLTA accounts, and that, unbeknownst to her at the time, her role with regard to her client had been to loan out her trust account to the perpetrators of what she now acknowledges to have been a scam. When asked to explain her assertions (made to the third party and to the Bar) that the third party's funds were "safe and protected" when much of the money had already been spent, McDonald said that she saw no issue with making those statements because she "didn't have any reason to believe that [the funds] weren't going to be returned if there was a problem," and that she honestly believed that her client would deliver the Bitcoin to the third party's digital wallet. She now admits that, in hindsight, her assurance to the third party that the third

party's funds were "safe and protected" was a false statement of material fact.

The Special Master found as fact that, at the time the third party wired the $4,000,000 into McDonald's IOLTA account, McDonald (1) "at minimum had reason to suspect that the deal would fail to close merely based on its association with [her client], whose numerous prior deals had failed to close"; (2) was trying to collect enough money to pay back other parties "from whom she ha[d] already received money into her trust account and disbursed" inappropriately at her client's direction; and (3) was trying to protect herself insofar as she had already told her client that an individual whose corporation was involved in one of the client's earlier deals had threatened to report her to the Bar if she failed to return his corporation's money. The Special Master further found that, prior to the federal lawsuit, McDonald took no steps to pay any of the money she appropriated back to the third party; that the third party settled its suit against McDonald on terms that provide only modest

13

recompense to it; and that it is uncertain if the third party has been made whole by other defendants in the federal lawsuit.

*Rule Violations*

*Rule 8.4 (a) (4) — False Statements*

Based on the foregoing facts, the Special Master found that McDonald violated Rule 8.4 (a) (4), which prohibits a lawyer from engaging "in professional conduct involving dishonesty, fraud, deceit or misrepresentation," when she misled the third party and its attorneys regarding the status of the $4,000,000 that it deposited in her IOLTA account. The Special Master concluded that McDonald's assertions — to the effect that she did not perceive herself to be an "independent escrow agent"; that she did not understand her obligation to provide the third party with complete and truthful information about the delivery of the Bitcoin and the status of its funds; and that she did not participate in any conduct "with the intent" to mislead the third party — not only strained credulity, but were irrelevant to the question because she intentionally made multiple statements and promises to the third party and its agents

14

about the status of the transaction and their funds; those statements were, at best, a deceitful artifice meant to string the third party along or, at worst, demonstrably and objectively false when she made them; and her statements were likely to, and did, mislead the third party and its agents. See *In the Matter of Woodham*, 296 Ga. 618, 625 (769 SE2d 353) (2015) (Rule 8.4 (a) (4) is meant to reach "conduct that is intended or likely to mislead another"); see also *In the Matter of Tuggle*, 317 Ga. 255, 272 (892 SE2d 761) (2023).

Noting that facts can be established through circumstantial evidence, the Special Master pointed to McDonald's "absurd [and] ultimately false" promise on January 9, 2019 — that she would send the third party 2,000 Bitcoin (i.e., $8 million worth) instead of 1,000 for the same $4,000,000 the third party had already paid — as evidence of her intent to mislead the third party into backing off its demand that she return the $4,000,000, much of which she no longer had in her possession. The Special Master also highlighted McDonald's interaction with the Bar and specifically her failure to correct the Bar's misunderstanding that "the funds were safely in

her trust account" as additional circumstantial evidence of her duplicity. The Special Master concluded that the most telling evidence on the issue of McDonald's duplicity and intent, however, was found in her admission, during a deposition, that she had sent an e-mail to her client on January 27, 2019, in which she pleaded with them to make things right and stated, "I have lied to these people [i.e., the third party and the intermediary] so much in an effort to buy myself some time. I do not like to lie and at some point it will catch up with me."

The Special Master found that this admission showed that McDonald's statements to the third party were not an error in judgment based on a misunderstanding of what it meant to be an independent escrow agent, but were part of a series of deliberate misrepresentations and deceits about the status of the third party's funds, intended by her to "buy herself some time" within which maybe her client would save her, perhaps with another "deal." Thus, the Special Master concluded that McDonald knowingly and deliberately sought to delude and delay the third party for as long

as she could; that she was not innocent or confused; and that she understood what she was doing.

*Rule 8.4 (a) (4) — Conversion of Third Party's Funds*

The Special Master additionally concluded that McDonald violated Rule 8.4 (a) (4) by stealing or converting the third party's funds to her own use. McDonald asserted that her use of the third party's funds was reasonable because her client authorized it, and because she was entitled to claim a portion of the funds as her fees. But the Special Master rejected that assertion, pointing out that McDonald had admitted to knowing that the $4,000,000 still belonged to the third party because the promised Bitcoin had not been delivered, and knowing that the third party had not authorized the disbursement of any of its funds.

The Special Master also discounted McDonald's belief that her client had authorized her to disburse the third party's money, noting that the record was devoid of evidence that anyone other than the third party had the right of ownership over any of the money it entrusted to her. In rejecting McDonald's argument that she did not

17

act with the requisite mental culpability since she claimed to have no intent to deceive or defraud, the Special Master noted that the transfers in this case did not happen as the result of negligence or accident; instead, McDonald intentionally caused the third party's money to be transferred to the various recipients she intended to receive it, and she did so without the third party's permission and in hostility to its rights to the money.

Further, the Special Master found absurd McDonald's claim that her intent should be judged according to her allegedly "honest belief" that she was entitled to take the third party's money for herself without the third party's permission or authority. The Special Master noted that, whatever McDonald said that she hoped would ultimately happen with the Bitcoin transaction, she actually intended to, and did, convert $1,585,800 of the third party's funds to her own purposes. Of the $1,585,800 that was never returned, McDonald claimed $440,000 as a "fee" and the remaining sum was disposed of for various other reasons. The Special Master also found that McDonald's belief that her client would make good on the

18

transaction did not deprive her of the capacity to intend the consequences of her conversion of the third party's funds.

For these reasons, the Special Master concluded that McDonald violated Rule 8.4 (a) (4) and engaged in "professional conduct involving dishonesty" when she knowingly, intentionally, and wrongfully converted the third party's funds. See *In the Matter of West*, 301 Ga. 901, 904 (804 SE2d 340) (2017) (noting that "[t]he Bar concurs with [the lawyer-defendant's] assertion that the 'dishonesty, fraud, deceit or misrepresentation' standard from Rule 8.4 (a) (4) contains an implicit intent element"); but see *In the Matter of Roberts*, 284 Ga. 445, 446 (668 SE2d 256) (2008) ("[A] negligent misrepresentation is sufficient for the imposition of discipline under Rule 8.4 (a) (4).").

*Rule 4.1 (a) — False or Misleading Statements to a Third Party*

Rule 4.1 (a) provides that a lawyer shall not, "[i]n the course of representing a client . . . knowingly [ ] make a false statement of material fact or law to a third person." The Special Master relied on the same evidence she recited as to McDonald's Rule 8.4 (a) (4)

19

violations to support her conclusion that McDonald knew her statement related to the third party's funds, specifically that those funds were "safe and protected," was objectively false at the time she made it, notwithstanding her hope that her client might fulfill his promise to the third party or give her enough money to pay the third party back its entire $4,000,000. Thus, the Special Master found that McDonald knowingly violated Rule 4.1 (a) by misleading the third party regarding the status of its $4,000,000.

*Rule 1.5 (a) — Unreasonable Fee*

With regard to the alleged violation of Rule 1.5 (lawyer shall not make an agreement for or collect an unreasonable fee), the Special Master first noted that an excessively large fee can be per se "unreasonable" where little or no work was performed in exchange for the fee. See *In the Matter of Hardy*, 316 Ga. 845, 850 (890 SE2d 770) (2023) (Rule 1.5 (a) violation when attorney "collected and retained $1,500 from the client without performing any services at all"); *In the Matter of Lain*, 311 Ga. 427, 437 (857 SE2d 668) (2021); *In the Matter of Majette*, 295 Ga. 4, 8 (757 SE2d 114) (2014). The

20

Special Master concluded that the approximately $440,000 fee McDonald claimed in this case was unreasonable because it was excessively large; not based on any work performed for the third party, the payor of the fee; and was not immediately returned as unearned after the deal was revealed as fraudulent.

The Special Master rejected McDonald's defenses — which were that her retention of the money was reasonable because it was expressly agreed to by her client, and that the fee she retained was reasonable because it was collected as compensation for services she provided to her client both in the transaction with the third party *and* in the months leading up to that transaction — noting again that McDonald had admitted to knowing that the $4,000,000 still belonged to the third party, and that the third party had not authorized disbursement of any of the funds. Further, McDonald did not specify how the services she actually rendered reasonably equated to the $440,000 of value that she claimed to have provided. The Special Master concluded that, under those circumstances, it was not reasonable for McDonald to use *the third party's* money,

21

without its agreement and while the funds were being held in trust, to pay fees owed by her client before the funds actually belonged to McDonald or her client. The Special Master also found telling the fact that, although McDonald now admits "in hindsight" that she was involved in her client's illegal "scam," she had taken no steps to fully return the unearned fee to the third party, which would be her responsibility. Thus, the Special Master determined that McDonald knowingly violated Rule 1.5 (a) by charging, collecting, and retaining the third party's funds as a fee without its authorization.[8]

*Rule 1.8 (e) — Advancing Money to a Client*

In considering the alleged violation of Rule 1.8 (e) (lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation with certain exceptions for costs and expenses), the Special Master noted that McDonald admitted she provided financial assistance to a bankruptcy client when she paid $5,644 to that client's bankruptcy trustee, and when she lent

---

[8] For reasons noted in our conclusion, we do not rely on this violation for purposes of the discipline imposed.

22

that client an additional $3,000. Pointing out that these advances did not fall within the exceptions set out in Rule 1.8 (e) for advancing or paying court costs and expenses of litigation for certain clients unable to afford those costs, the Special Master concluded that the payments provided financial assistance to her client in connection with pending litigation, and held that McDonald thus violated Rule 1.8 (e) "no matter how benevolent [her] motives" may have been.

*Rule 1.15 (I) (a), (c), and (d) — Safekeeping Property — General*

Turning her focus to McDonald's trust account, the Special Master first recited that Rule 1.15 (I) (a) requires a lawyer to hold funds of clients or third persons that are in her possession in connection with a representation separate from her own funds or other property; appropriately safeguard those funds; and keep complete records of them. Rule 1.15 (I) (d) provides that, when a dispute arises over various parties' interests in money or property being held by the lawyer, the lawyer shall promptly distribute all undisputed portions of the funds or property and keep separate the

portion in dispute until the dispute is resolved, or, if a resolution cannot be reached, to interplead such disputed funds or property.

The Special Master noted that, here, McDonald knew that entitlement to the entire $4,000,000 was being claimed by the third party, but she did not voluntarily return any of the money until after the third party filed its grievance and federal lawsuit (and the federal court ordered her to pay the money into the court's registry). And even then, she only paid into the court a small fraction of the amount she had received. The Special Master also noted her admissions that she was the escrow agent for the deal; that the funds belonged to the third party, as no Bitcoin was ever transferred to its digital wallet; that the third party had not given her any authority to disburse any of its money; that she nevertheless disbursed more than $440,000 of the third party's money to herself, her family, and her friends; and that more than a year after the third party filed its grievance against her she was still claiming more than $200,000 of the third party's money as lawful fees from her clients.

24

Given those admissions, the Special Master concluded that, regardless of McDonald's position that she was acting on behalf of her "clients" with regard to the third party's money rather than as an "independent escrow agent," McDonald violated the duties Rule 1.15 (I) (a) and (d) impose upon her as a *lawyer*, because she never held the third party's money apart from her own and instead commingled its money with her own funds when she disbursed it to various parties rather than returning it to its rightful owner when the transaction failed to close. See *In the Matter of Doeve*, 303 Ga. 672 (814 SE2d 330) (2018); *In the Matter of Axam*, 297 Ga. 786, 786-787 (778 SE2d 222) (2015); *In the Matter of Anderson*, 286 Ga. 137, 140 (685 SE2d 711) (2009) (lawyer who received funds in escrow from a depositor for a real estate transaction involving lawyer's client and who "paid himself $30,000 from the escrowed funds without [depositor's] knowledge or consent . . . [when he] was not entitled to any of the escrowed funds as fees and it was his duty to safeguard those funds for [depositor]," violated Rules 1.15 (I) and 1.15 (II)).

In addressing Rule 1.15 (I) (c), the Special Master recited that the Rule commands that "[u]pon receiving funds or other property in which a . . . third person has an interest, a lawyer shall promptly notify the . . . third person" and "shall promptly deliver to the . . . third person any funds or other property that the . . . third person is entitled to receive and, upon request by the . . . third person, shall promptly render a full accounting regarding such property." Noting McDonald's admissions that she received the third party's money in a fiduciary capacity; that she owed a fiduciary duty to the third party at least with regard to funds on deposit with her; that she knew she received the funds to facilitate the Bitcoin transaction, which never closed; that she knew her client would not be entitled to the money unless it delivered the Bitcoin; that she nevertheless disbursed a large portion of the third party's funds to entities other than the third party before the deal closed without notifying the third party or obtaining its consent or authorization; and that she failed to account for the funds despite the third party's repeated requests that she do so (forcing it to file a lawsuit and engage in discovery to

26

determine what happened to its money), the Special Master concluded that McDonald violated Rule 1.15 (I) (c).

*Rule 1.15 (II) (a) and (b) — Safekeeping Property — Trust Accounts*

The Special Master first recited that Rule 1.15 (II) (a) requires that "all funds held by a lawyer in any [ ] fiduciary capacity shall be deposited in and administered from a trust account." Rule 1.15 (II) (b) requires both that records of such accounts be maintained so as to "reflect at all times the exact balance held for each client or third person" and that "[n]o funds shall be withdrawn from such trust accounts for the personal use of the lawyer maintaining the account except earned lawyer's fees debited against the account of a specific client and recorded as such." The Special Master noted that, here, McDonald was acting in her capacity as a lawyer in connection with the Bitcoin transaction; that, as a result, the third party deposited funds into her IOLTA account to be held in escrow; that she received those funds in a fiduciary capacity; that she improperly disbursed those funds; and that she did not keep and maintain records of her

27

trust account. Thus, the Special Master concluded that McDonald violated Rule 1.15 (II) (a) and (b).

*Rules 7.1 and 7.5 (a) and (d)*

Pointing to McDonald's admission that she identified her firm as "McDonald Law Group, LLC" while she was in fact a solo practitioner, see n.2, supra, the Special Master determined that McDonald had violated Rules 7.1 (lawyer shall not, in relevant part, make a false or misleading communication about herself or her services) and 7.5 (a) and (d) (lawyer may not falsely state or imply through letterhead, firm or trade name, or other professional designation that she practices in a partnership or other organization). The Special Master rejected McDonald's assertion that this violation was not "materially misleading," citing *State Bar of Georgia, Formal Advisory Opinion 16-3* (June 14, 2016), which established "the principle that any name implying that a firm is larger than it truly is [including use of the word 'Group' in the firm name of a solo practitioner] will be considered false, fraudulent,

deceptive, or misleading and, therefore, a violation of Rules 7.1 and 7.5."

*Application of ABA's Theoretical Framework*

The Special Master then recognized that this Court relies on the ABA Standards for Imposing Lawyer Sanctions (1992) ("ABA Standards") for guidance in determining punishments in disciplinary cases, and that those Standards require consideration of: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the misconduct; and (d) the existence of aggravating or mitigating factors. See ABA Standard 3.0; *In the Matter of Morse*, 266 Ga. 652, 653 (470 SE2d 232) (1996).

*Duties Violated; Mental State; and Injury/Potential Injury*

The Special Master determined, in relevant part, that McDonald's Rules violations implicated the duties identified in ABA Standards 4.1 (failure to preserve property of a client or third party), 4.3 (failure to avoid conflicts of interest), 5.1 (failure to maintain personal integrity), and 7.0 (violations of other duties as a professional). The Special Master found that McDonald did not

29

claim to suffer from any impairment that would have impacted her ability to understand her duties in this matter and concluded that McDonald's belief that her client would do the right thing in the end did not alter the conclusion that her violations, for the most part, were intentional and knowing.[9] Finally, the Special Master noted the fact that McDonald's actions resulted in actual and significant financial injury to the third party. Thus, the Special Master concluded that disbarment was the presumptive discipline based on McDonald's violations, taken together.

*Aggravating and Mitigating Factors*

The Special Master found that several factors worked to aggravate the degree of discipline that should be imposed on McDonald. As an initial matter, she has a prior disciplinary history.[10] Moreover, she acted with a dishonest and selfish motive,

---

[9] The only exception to that determination was the Special Master's conclusion that McDonald's violations of Rules 7.1 and 7.5 (a) and (d) likely arose out of her negligent failure to change her firm's name after the other attorney left the firm. See n.2, supra.

[10] Specifically, McDonald received an Investigative Panel reprimand on March 30, 2012, in a case involving violations of Rules 1.4 (failure to

30

see ABA Standard 9.22 (b); her actions represented the continuation of a pattern of misconduct going back to her client's earlier deals, which were also never consummated, see ABA Standard 9.22 (c); she was guilty of multiple violations of the Rules, see ABA Standard 9.22 (d); she was deceptive during the initial phases of the disciplinary process when she made materially misleading statements to the Bar, see ABA Standard 9.22 (f); although now remorseful, she repeatedly blamed others for the third party's injury, refusing to acknowledge that but for her failure to abide by the Bar Rules, no injury would have come to the third party, see ABA Standard 9.22 (g); and she had substantial experience in the practice of law, having been admitted in 1985, see ABA Standard 9.22 (i).

In addition, the Special Master noted that, although McDonald eventually returned half of the funds the third party entrusted to her, she has shown an indifference to making restitution for the

---

communicate), 1.16 (d) (failure to return unearned fee at conclusion of representation), and 8.4 (deception and conversion), which was not dissimilar to the instant case given that, here, she disbursed to herself a fee that she eventually admitted she had not earned. See ABA Standard 9.22 (a)

remaining damages it suffered, forcing it to sue her to obtain relief, and using the third party's money to hire counsel to defend herself in that suit, see ABA Standard 9.22 (j). Finally, the Special Master noted that, even though McDonald has, to date, avoided criminal sanctions, she seems to have participated in an illegal scheme, which involved enticing others to wire money into her trust account under the guise of being a fiduciary, see ABA Standard 9.22 (k).

The Special Master did not cite to any of the mitigating factors specifically identified in ABA Standard 9.32, but acknowledged that McDonald had been a longstanding member of the Bar, representing clients in a wide variety of matters with only one prior complaint, which did not include a trust account violation.[11] The Special Master rejected McDonald's claim that her discipline should be mitigated by evidence of her general character and reputation,[12] noting that, although she had provided credible and sincere character testimony

---

[11] This discussion could arguably implicate the mitigating factor of remoteness of prior offenses, see ABA Standard 9.32 (m), although the Special Master did not categorize it as such.

[12] See ABA Standard 9.32 (g).

32

establishing that she contributed to her church and her community in meaningful ways to the benefit of society, that testimony provided no mitigating evidence of significant weight as none of those witnesses had any understanding of the significance of McDonald's misconduct and the injury to the public. See *In the Matter of Nicholson*, 299 Ga. 737, 740-741 (791 SE2d 776) (2016) (finding "no mitigating circumstance[s] of significant weight" where character witnesses only testified to attorney's reputation as an effective advocate).

Similarly, the Special Master seemingly rejected McDonald's effort to rely on remorse[13] as a mitigating factor, noting that while she now appears to be remorseful and able to articulate the significance of her misconduct, she was not persuasive in her effort to demonstrate that she understood either her role in this scam or the fact that she benefitted significantly from it. Finally, the Special Master rejected McDonald's effort to establish that she took steps to

---

[13] See ABA Standard 9.32 (l).

rectify the consequences of her misconduct,[14] noting that, although she entered into a settlement agreement in the federal lawsuit with the third party, her capitulation came only after she forced the third party to sue her to extricate its remaining money from her trust and operating accounts; that she did not voluntarily return the funds remaining in her accounts until forced to do so by the federal court; and that, even after the third party served her with its lawsuit, she used its funds to pay an attorney to represent her in that suit (even though the attorney later disgorged some of those funds). Ultimately, the Special Master determined that McDonald's conduct in this incident militates against mitigation.

*Recommendation for Discipline*

The Special Master concluded that McDonald violated Rules 1.5 (a); 1.8 (e); 1.15 (I) (a), (c) and (d); 1.15 (II) (a) and (b); 4.1 (a); 7.1 (a); 7.5 (a) and (d); and 8.4 (a) (4) and that the severity of the infractions and the significance of the injury justified imposition of

---

[14] See ABA Standard 9.32 (d).

the highest level of discipline. Therefore, the Special Master recommended that McDonald be disbarred.

*McDonald's Exceptions*

McDonald sought review from the Review Board, taking exception to the following points: (1) the Special Master's conclusions that McDonald was knowingly involved in her client's scam, that she pocketed exorbitant sums from her involvement, and that she used the third party's money to pay her defense counsel in the federal suit; (2) the Special Master's refusal to give more weight to the testimony of McDonald's character witnesses and to McDonald's own explanation that she acted in good faith based on the limited knowledge she had of the Bitcoin industry, which was then a relatively new enterprise; (3) the Special Master's conclusions as to the applicability of the various factors in aggravation of discipline; (4) the Special Master's decision to use McDonald's prior discipline as an aggravating factor, when it was more than ten years old and involved dissimilar facts; and (5) the Special Master's refusal to find that any of the factors in mitigation applied in this case.

35

McDonald asserted that disbarment was not warranted because the proceedings painted a picture of unconscious bias, and the grievance involved a nefarious client under a very specific set of circumstances. She contended that she should be given some lesser discipline or be allowed to retire from the practice of law.

*The Bar's Response to McDonald's Exceptions*

The Bar responded to each of McDonald's exceptions, asserting generally that the Special Master was in the best position to determine the witnesses' credibility, that the Special Master's factual findings were amply supported by the record, and that her conclusions of law were appropriate. The Bar further responded that McDonald had provided no evidence to support her assertions of unconscious bias and that none existed. The Bar argued that the GRPC exist to protect the public from unethical lawyers, regardless of whether their clients are engaged in shadowy conduct of their own. Finally, the Bar concluded that, because McDonald could have (and likely would have) gone on to defraud another member of the public, hoping to get back the funds she needed to re-pay the third

party in this deal, McDonald is exactly the kind of lawyer from whom the GRPC exist to protect the public.

*The Review Board's Report and Recommendation*

The Review Board issued a fairly brief Report and Recommendation, reciting that it had engaged in a "careful review of the record and evidence," and concluding that the Special Master's factual findings were supported by the record and that McDonald had not shown that those findings were clearly erroneous or manifestly in error. Similarly, the Review Board considered the Special Master's analysis of the issues presented and concluded that her conclusions of law were correct. Therefore, the Review Board adopted and incorporated the Special Master's findings of fact and conclusions of law in full.

Further, the Review Board agreed with the Special Master's analysis of the duties violated, McDonald's mental state, the potential or actual injuries caused by McDonald's misconduct, and the aggravating and mitigating factors to be applied to this matter. The Review Board thus recommended that this Court adopt the

Special Master's findings related to the appropriate level of discipline and disbar McDonald.

*McDonald's Exceptions to the Review Board's Report*[15]

In her exceptions to the Review Board's Report and Recommendation, McDonald complains that the Board has not fully indicated the scope of its review, and contends that it should have done its own analysis to support the Special Master's conclusion that the Bar had met its burden of proving by clear and convincing evidence each element of the alleged violations at the time they purportedly occurred. She contends that a thorough and fair

---

[15] In addition to filing exceptions to the Review Board's Report and Recommendation, McDonald also filed directly in this Court a petition — allegedly pursuant to Bar Rule 1-202 (f) (1) and (3) — asking to be transferred to retirement status rather than face disbarment. It is unclear whether McDonald is seeking review of the Office of the General Counsel's ("OGC") denial of the request that she made there, or whether she intends to petition this Court for such relief in the first instance, but Bar Rule 1-202 does not contemplate making a request directly to this Court, and instead clearly directs that any request to be transferred to retirement status be made to the Bar, and that a member "with a pending disciplinary matter" may only transfer to retired status if she obtains the consent of the OGC. See Bar Rule 1-202 (f) (1) and (3). In addition, Bar Rule 1-202 includes no provision for appealing the OGC's denial of such a ruling. Accordingly, her "petition" is dismissed.

examination of the record in this case will support her position that disbarment is not the appropriate discipline.

*The Bar's Response to McDonald's Exceptions*

In response, the Bar notes that the Bar Rules give the Review Board the power and duty "to review reports of Special Masters" and to recommend discipline to this Court, see Bar Rule 4-215 (a); the power to "reverse" the Special Master's findings of fact if the Review Board finds them to be "clearly erroneous or manifestly in error," see Bar Rule 4-216 (a); and the power to review de novo the Special Master's "conclusions of law" and "determinations of appropriate sanctions." Id. The Bar argues that the Review Board's Report and Recommendation shows that it undertook such a review and concluded that the discipline recommended by the Special Master was appropriate. The Bar states that the burden is on McDonald to show specifically where and how the Review Board and/or the Special Master were biased during the proceedings and that she has not even tried to meet that burden, instead simply asserting that a new examination of the record by this Court would not support

disbarment. The Bar states that it welcomes such a fresh review, confident that a new examination would support the same discipline recommended by the Special Master and Review Board.

*Conclusions*

Although McDonald filed exceptions to the Report of the Review Board, she does not challenge the Special Master's conclusions that she violated Rules 1.5 (a);[16] 1.8 (e); 1.15 (I) (a), (c), and (d); 1.15 (II) (a) and (b); 4.1 (a); 7.1 (a); 7.5 (a) and (d); and 8.4 (a) (4) of the GRPC, and, after considering the entire record presented to this Court, we agree with the Special Master's conclusions in that regard. Further, although McDonald's exceptions essentially ask this Court to reconsider the discipline recommended by the Review Board and the Special Master, she fails

---

[16] As noted above in our discussion of the Special Master's findings, we do not rely on the Special Master's finding that McDonald committed a Rule 1.5 (a) violation in determining the discipline in this case. Indeed, we pretermit whether McDonald committed a Rule 1.5 (a) violation, because determining whether she did violate Rule 1.5 (a) would require an analysis of whether the funds that McDonald was found to have converted (i.e., taken without authorization) could be claimed as a legal fee. Because answering that question is not necessary to the disposition of this case, we do not address the alleged Rule 1.5 (a) violation further.

to show how the recommended discipline is inappropriate, and our own review indicates that it is not. Indeed, McDonald's admitted lies (or misrepresentations) to the Bar and to the third party about the status of the third party's funds in her trust account together with her conversion of a large portion of those funds (i.e., the violations of Rules 8.4 and 4.1) alone support disbarment. Moreover, when those actions are combined with McDonald's continuing refusal to see or acknowledge the pivotal role she played in the misdeeds apparently being perpetrated by her client and the fact that she has not made the third party whole, we cannot fathom a punishment less than disbarment. On top of those violations, McDonald also blatantly violated Rules 1.15 (I) and (II) in her handling of the money that was entrusted to her and deposited into her IOLTA account. McDonald's complete disregard for her role as a fiduciary in this transaction (and apparently other transactions) is staggering and would support disbarment on its own as well.

We also agree that the other factors cited by the Special Master in aggravation of punishment apply to this case and that, on the

record now before us, no factors in mitigation apply. Therefore, we agree that disbarment is the appropriate sanction in this case, and it is hereby ordered that the name of Diana Y. McDonald be removed from the rolls of persons authorized to practice law in the State of Georgia. McDonald is reminded of her duties pursuant to Bar Rule 4-219 (b).

*Disbarred. All the Justices concur.*

Decided June 11, 2024.

Disbarment.

*Paula J. Frederick, General Counsel State Bar, William D. NeSmith III, Deputy General Counsel State Bar, Jenny K. Mittelman, James S. Lewis, Assistant General Counsel State Bar*, for State Bar of Georgia.